682 P.2d 388

**DARNER MOTOR SALES, INC., d/b/a Darner Leasing Co., an Arizona corporation, Third-Party Plaintiff-Appellant,**

v.

**UNIVERSAL UNDERWRITERS INSURANCE COMPANY, John Brent Doxsee, Third-Party Defendants-Appellees.**

No. 16551-PR.

Supreme Court of Arizona,
En Banc.

March 29, 1984.
Reconsideration Denied May 22, 1984.

Udall, Shumway, Blackhurst, Allen, Lyons & Davis by John H. Lyons, Clark R. Richter, Mesa, for third-party plaintiff-appellant.

Black, Robertshaw, Frederick, Copple & Wright by Harold A. Frederick, Philip Thorpe, Phoenix, for third-party defendants-appellees.

FELDMAN, Justice.

Darner Motor Sales, Inc., dba Darner Leasing Co. (Darner Motors), petitions for review of a memorandum decision of the court of appeals (Darner Motor Sales, Inc. v. Universal Underwriters Insurance Company, No. 1 CA–CIV 5796, filed February 22, 1983). That decision affirmed a summary judgment in favor of Universal Un-

derwriters Insurance Company (Universal) and their agent, John Brent Doxsee (Doxsee), who were the third party defendants impleaded by Darner Motors. We granted review because we believe that the issues presented call into question the clarity and consistency of a large body of Arizona law dealing with insurance coverage. We have jurisdiction pursuant to Ariz. Const. Art. 6, § 5(3) and Rule 23, Rules of Civ.App.P., 17A A.R.S.

## FACTS

Darner Motors is in the automobile sales, service and leasing business. Prior to transacting business with Universal, Darner Motors' various operations were insured under several policies issued by The Travelers Company (Travelers). In October of 1973, Doxsee, an insurance agent who was a full-time employee of Universal, contacted Joel Darner to solicit insurance business. The following month, Darner purchased a Universal "U-Drive policy" through Doxsee. This policy insured Darner Motors and the lessees of its cars for automobile liability risk. Darner Motors was covered in limits of $100,000 for any one injury and $300,000 (100/300) for all injuries arising out of any one accident. The lessees were covered in limits of 15/30. The rest of Darner Motors' business risks continued to be insured under a "dealership package policy" issued by Travelers.

It is unclear from the record, but this situation presumably continued until April of 1975, a renewal date of the Travelers policy. In April of 1975, Universal "picked up" the entire insurance "package" for Darner Motors' various business activities. This "package" consisted of a Universal "Unicover" policy which included coverage for garagekeeper's liability, premises liability, property coverage, crime coverage, customer car coverage, and plate glass insurance. The parties describe this as an "umbrella policy," so it is possible that, in addition to covering multiple risks, it also contained excess coverage over other policies which provided primary coverage.[1] In addition to the umbrella policy, Universal also renewed the U-Drive policy, which provided coverage to the lessees of Darners Motors.[2]

Substantial controversy exists with regard to many of the factual allegations. However, according to Darner, he informed Doxsee that renewal of lessee coverage was to be in the same limits as applied to Darner Motors in the original U-Drive policy. When the new U-Drive policy arrived after renewal in April of 1975, Darner examined it and noticed that the limits of coverage for lessees were 15/30. After reading this, Darner claims that he called Doxsee. He was concerned because his rental contract contained a representation of greater coverage (100/300) and because he felt that it would be better for his business operation if his lessees had the higher coverage. Darner told Doxsee that the liability limits of the U-Drive policy did not conform to their prior agreement, and asked Doxsee to come to Darner Motors and discuss the matter. Doxsee did call upon Mr. Darner at the latter's office. Although Doxsee could not recall the subsequent conversation, both Darner and his former sales manager, Jack Hadley, testified about the discussion. Their deposition testimony would support a finding that Doxsee told Darner not to worry about the limits because, although the U-Drive policy provided only 15/30 coverage, the all-risk clause of the umbrella policy would provide additional coverage to limits of 100/300.[3]

---

1. It is difficult to tell just what was or was not insured under this "umbrella policy" since a copy of the policy is not part of the record, even though the coverage contained in that policy is the precise issue in the case.

2. Lessors are required to provide such insurance to their lessees, A.R.S. § 28–324. The statute also provides that if the lessor fails to do so, it is jointly and severally liable for all damages caused by the lessee while driving the leased vehicle.

3. As might be expected, although Doxsee does not remember the substance of the conversation, he is quite sure he could have told Darner no such thing. Darner's testimony was impeached by evidence that he subsequently reduced the limits on his rental forms from 100/300 to 15/30. Darner explains this by stating that Doxsee told him that it was better to

At some time after he received the U-Drive policy and, presumably, also after his discussions with Doxsee, Darner did receive a copy of the umbrella policy. That policy was evidently quite lengthy and forbidding. Darner admits never reading it; he explained this omission by pointing out that "it's like reading a book" and stating that, following his conversations with Doxsee, "I didn't think I needed to." Darner's office manager testified that she never really read the policy either and saw little need to do so in view of the fact that Doxsee would occasionally appear, remove pages from the loose-leaf binder and insert new pages. So far as the record shows, the printed, boiler-plate provisions contained in the loose-leaf type, "book length," all-risk policy were neither negotiated before nor discussed after the policy was delivered. The parties seem to have confined themselves to a discussion of the objectives that would be realized from the purchase of the policy rather than an attempt to negotiate the wording of the policy.

Approximately twenty months after the conversation between Darner and Doxsee concerning coverage under the Universal policies, Darner Motors rented a car to Dwayne Crawford. The transaction was in the ordinary course of business, except that the form used for the rental agreement was the "old type," which contained a representation of coverage in the amount of 100/300.[4] While driving the vehicle under this rental contract, Crawford negligently injured a pedestrian and caused severe injuries. The pedestrian sued Crawford, who looked to Universal for coverage. Universal claimed that lessee's coverage on the "U-Drive" policy was limited to 15/30. Crawford then sued Darner Motors under the rental agreement warranty that coverage was provided in limits of 100/300. Darner Motors called upon Universal to provide additional coverage under the um-

brella policy. The umbrella policy did contain the higher limits, but Universal claimed that lessees were not parties "insured" as that term was defined in the all-risk policy. Universal was therefore unwilling to provide coverage in excess of the $15,000 limit of the U-Drive policy. Darner Motors then filed a third-party complaint, naming Universal and Doxsee as third party defendants.

Eventually, the pedestrian recovered $60,000 from Crawford. Universal paid $15,000 of this amount, and Darner Motors has either paid or is liable to Crawford for the remainder. Darner Motors claims that Universal and Doxsee are obligated to indemnify it against that loss. To support that contention, Darner Motors advances the following theories:

(1) Universal is estopped to deny coverage for lessees under the umbrella policy in amounts less than 100/300;

(2) The umbrella policy should be reformed so that it does contain such coverage;

(3) If no coverage is found through estoppel or reformation, then the loss incurred by Darner Motors was caused by the negligence of Universal and its agent, Doxsee, and should be borne by them;

(4) If no coverage exists by way of estoppel or reformation, then the loss incurred by Darner Motors is the result of fraud committed by Universal and its agent, Doxsee.

After considerable discovery, Universal and Doxsee moved for summary judgment, contending that there was no genuine issue of fact and that they were entitled to judgment as a matter of law. The motion was granted and judgment entered against Darner Motors. The court of appeals affirmed; pointing out that Darner Motors had not claimed that the umbrella policy was ambiguous, the court held that the

represent the coverage limits at the minimum required by the state so as to discourage plaintiffs' lawyers from pursuing claims for their badly injured clients. As in most such cases, who told what to whom is hotly contested, and

there is much to be said for both versions of the facts.

4. See footnote 3, *supra.*

insured's failure to read the policy prevented recovery on any theory, even though the contents of the policy did not comport with the representations of the insurance agent and those same representations were a part of the reason that the insured failed to read the policy.

The court of appeals stated that under Arizona law an insured who had received a copy of an unambiguous policy could not "expand the insurer's liability beyond the terms of the ... policy issued ...." We believe this statement is too broad, though we acknowledge that the law is, at best, confused on this subject. In an attempt to bring some clarity and logic to the question, we have reviewed our cases and will discuss each of the theories advanced by Darner Motors. Before doing so, however, we must consider the inherent nature of an insurance contract and of the issues presented by the fact situation before us.

## CONTRACT LAW AND INSURANCE POLICIES

■ Since this is an appeal from summary judgment, we must view the facts in the light most favorable to the party against whom judgment was taken. *Gulf Insurance Co. v. Grisham,* 125 Ariz. 123, 124, 613 P.2d 283, 284 (1980). Taking the facts in that light, the question we must decide is whether the courts will enforce an unambiguous provision contrary to the negotiated agreement made by the parties because, after the insurer's representations of coverage, the insured failed to read the insurance contract which was in his possession.[5]

Implicit in the reasoning of the court of appeals is the concept that the insurance policies purchased by Darner constitute *the* contract between Darner and Universal.

Darner is considered to be bound by the terms contained within the documents. The court of appeals held:

> Because Mr. Darner received a copy of the umbrella policy and made no contention that it was ambiguous or confusing, he cannot expand the insurer's liability beyond the terms of the umbrella policy issued by Universal.

(slip op. at 7). Basic to this holding is the principle that the oral agreement between Doxsee and Darner cannot be shown to vary the terms of the insurance policy. This, indeed, was at one time the majority view. See cases cited in 12 Appleman, *Insurance Law and Practice* § 7155 (1981); similar language is contained in *Parks v. American Casualty Co. of Reading, Pa.,* 117 Ariz. 339, 572 P.2d 801 (1977); *Sellers v. Allstate Insurance Company,* 113 Ariz. 419, 422, 555 P.2d 1113, 1116 (1976); *see also Western Farm Bureau Mut. Ins. Co. v. Barela,* 79 N.M. 149, 441 P.2d 47 (1968). Some cases, including those from our own state, hold that since insurance policies are like other contracts, where the meaning and intent of the parties is "clear" from the words used in the instrument, the courts cannot "rewrite" the policy by considering the actual "words" used in striking the bargain. Thus, the rule of interpretation is stated to be that the intention of the parties as derived from the language used within the four corners of the instrument must prevail. *See, e.g., Rodemich v. State Farm Mutual Auto Insurance Co.,* 130 Ariz. 538, 539, 637 P.2d 748, 749 (App.1981) (a vehicle which turned over and was damaged when the driver swerved to avoid an animal was not covered under the "upset" clause of a comprehensive risk policy because "upsets" result-

---

**5.** In characterizing the issue in this manner, we acknowledge that the insured did read the terms of the policy covering lessees and did discover the error in that policy. He was told by the agent that the umbrella policy provided the additional coverage. He did not read the provisions of the umbrella policy. Although that policy is not part of the record, we assume that it contains a clause or clauses defining the word "insured" in such a manner that lessees are excluded from the class of persons insured by

the policy. We assume further that this definitional exclusion is clear and unambiguous. Therefore, it could have been found, read and understood by Darner. Of course we have no way of knowing that these assumptions are correct; however, it was the appellant's burden to make an adequate record on appeal. Since the appellant failed to offer the policy in evidence at the trial, we settle all factual uncertainty in favor of supporting the judgment of the trial court.

ing from attempts to avoid collision with animals were not covered unless there was actual contact).

*Rodemich* is a good example of the mischief made by applying ordinary contract law to insurance policies. No doubt it would have come as a great surprise to Mr. and Mrs. Rodemich (and, also, to the State Farm agent who sold the policy) to learn that they had formed any intent to delete collision coverage—which covers physical damage even when there is no collision— and to include comprehensive coverage, which generally excludes "collision" damage but covers other physical damage, such as that caused by upset, except upset damage resulting from attempts to avoid birds or animals. In the latter situation there is coverage under the comprehensive clause only if one collides with the bird or animal. It would have surprised the Rodemichs even more to learn of the method by which the court was able to determine, from the four corners of the instrument, their specific intent not to be covered for physical damage resulting from the overturning of their vehicle in a successful attempt to avoid striking an animal on the road. The court reasoned as follows:

> However, [coverage D of the policy includes the clause] a "loss caused by ... *colliding* with birds or animals shall not be deemed to be loss caused by colli-

sion." (Emphasis added). Hence, Coverage D provides that a loss caused by *colliding* with an animal would be within the comprehensive coverage. We believe that the policy's use of the term "colliding," rather than the term "collision" which was specifically defined in the policy, indicates that, "collision" and "colliding" are not the same thing under policy. "Collision is defined to include "upsets" of the covered vehicle, regardless of the cause, and therefore does not require any contact between the vehicle and any other object. Because the policy used the different term "colliding" in excluding from the definition of "collision" any "loss caused by ... colliding with birds or animals," we believe that the terms of the policy indicate that the *parties intended* "colliding with ... animals" to be read in its ordinary dictionary sense and thus to require an actual striking, clashing, or coming together of the motor home and an animal. Therefore, unless the motor home actually struck the animal, there was no "loss caused by ... colliding with ... animals." Instead, the motor home suffered an upset, within the definition of "collision" excluded from the comprehensive coverage.

*Rodemich v. State Farm*, 130 Ariz. at 540, 637 P.2d at 750 (footnote omitted, last emphasis supplied.)[6] At best, such reasoning,

---

6. *Rodemich is not singled out for criticism. It is not an abberation; it is typical of the traditional reasoning applied to interpretation of insurance contracts. A recent example of this can be found in State Farm Insurance Company v. Gibbs, 139 Ariz. 274, 678 P.2d 459 (App.1984). In Gibbs the court of appeals followed previous Arizona authority and concluded from the four corners of the agreement that the parties had unambiguously expressed an intent that the policy should contain an exclusion (known as the "named insured exclusion") deleting from liability coverage all claims which the named insured or his relatives might assert against any permissive driver covered under the omnibus clause of the policy. We cannot pretend that Mr. Gibbs, presumably an average person, had any idea that the policy contained such a clause, or, had he understood its ramifications, would have intended that his premium dollars should be used to protect the entire world except the members of the Gibbs family. Gibbs' intention would probably have been exactly contrary. To sup-*

port this fiction regarding the insured's intention the court creates a second—that Gibbs bargained, for a lower premium, to get a policy with such an exclusion. The use of the second fiction requires yet a third—that for a higher premium, one could induce State Farm to change its standard auto policy and delete the named insured exclusion. Such a negotiation might be possible for IBM, bargaining to insure its fleet. It defies belief to attribute such power to any ordinary customer. *Gibbs* relies on *New York Underwriters Insurance Company v. Superior Court*, 104 Ariz. 544, 456 P.2d 914 (1969). In *New York Underwriters* this court applied the same three assumptions pertaining to the insured's intent. In neither case was there evidence or fact to support the analysis. The assumptions made are contrary to common knowledge of the manner in which the great bulk of insurance business is transacted. We believe the time has come to remove insurance law from the land of make-believe.

based on patently unfounded assumptions of intent, is result oriented; at worst, it makes no sense. If there was some reason why the Rodemichs should not have prevailed, there must be some better way to find and articulate what it might be.' Artificial results derived from application of ordinary rules of contract construction to insurance policies have made courts struggle to find some method of reaching a sensible resolution within the conceptual bounds of treating standardized, formal contracts as if they were traditional "agreements," reached by bargaining between the parties. This difficult task is often accomplished by the use of various constructs which enable courts to reach a desired result by giving lip service to traditional contract rules. One of the most prominent of these methods is the well recognized principle of resolving ambiguities against the insurer. *See Almadova v. State Farm Mutual Automobile Ins. Co.*, 133 Ariz. 81, 649 P.2d 284 (1982). The limitations of this principle have been discussed by Professor Robert Keeton, who comments that

> [t]he principle of resolving ambiguities against the draftsman is simply an inadequate explanation of the results of some cases. The conclusion is inescapable that courts have sometimes invented ambiguity where none existed, then resolved the invented ambiguity contrary to the plainly expressed terms of the contract document.

Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv.L. Rev. 961, 972 (1970) (footnotes omitted). Our court of appeals has attempted to avoid the problem of invented ambiguity by stating the principle that courts should not create ambiguities in order to rewrite the policy. Cf. *Barber v. Old Republic Life Ins. Co.*, 132 Ariz. 602, 604, 647 P.2d 1200, 1202 (App.1982) with *State Farm v. Gibbs*, *supra*. However, we also follow the rule of construction that where different jurisdictions reach different conclusions regarding the language of an insurance contract "ambiguity is established," *Federal Insurance Co. v. P.A.T. Homes, Inc.*, 113 Ariz.

136, 138, 547 P.2d 1050, 1052 (1976); thus, we may find ourselves justly criticized for accepting the inventions of other courts. It is also illogical to hold that an unexpected, unknown ambiguity in a clause which the parties did not negotiate, write or read should permit them to show the true terms of the agreement, but that the lack of such an ambiguity prevents them from so doing.

Such systems of logic—or illogic—have been criticized by Keeton, *supra*, and others for failing to recognize the realities of the insurance business and the methods used in modern insurance practice. *See, e.g., Zuckerman v. Transamerica Ins. Co.*, 133 Ariz. 139, 144–46, 650 P.2d 441, 446–48 (1982); *Harr v. Allstate Insurance Co.*, 54 N.J. 287, 301–04, 255 A.2d 208, 216–18 (1969); Restatement of Contracts (Second) § 211, comment b, and authorities cited in the reporter's note thereto; Abraham, *Judge-Made Law and Judge-Made Insurance: Honoring the Reasonable Expectations of the Insured*, 67 Va.L.Rev. (1981); Murray, *The Parole Evidence Process and Standardized Agreements under the Restatement (Second) of Contracts*, 123 U.Pa.L.Rev. 1342 (1975).

Abraham, *supra*, argues that "insurance law should be brought into the mainstream of our jurisprudence," and notes that "in many states, a principle authorizing the courts to honor the 'reasonable expectations' of the insured is emerging." *Id.* at 1151. "Emergence" is probably an inaccurate description of the use of the reasonable expectations test since, if correctly understood, that doctrine has long been a basic principle in the law of contracts.

> That portion of the field of law that is classified and described as the law of contracts attempts the realization of *reasonable expectations that have been induced* by the making of a promise.

1 Corbin, *Contracts* § 1, at 2 (1963) (emphasis supplied). We have previously recognized the doctrine of "reasonable expectations." *Zuckerman v. Transamerica Ins. Co.*, 133 Ariz. at 146, 650 P.2d at 448; *Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 536–37, 647 P.2d 1127, 1134–35,

*cert. denied,* 459 U.S. 1070, 74 L.Ed.2d 632, 103 S.Ct. 490 (1982). Of course, if not put in proper perspective, the reasonable expectations concept is quite troublesome, since most insureds develop a "reasonable expectation" that every loss will be covered by their policy. Therefore, the reasonable expectation concept must be limited by something more than the fervent hope usually engendered by loss. Such a limitation is easily found in the postulate contained in Corbin's work—that the expectations to be realized are those that "have been induced by the making of a promise." 1 Corbin, *supra* § 1 at 2.

We think it better, then, to start the analysis by attempting to determine what expectations have been induced. We note the concept that contracts are not merely printed words. The words, of course, are usually of paramount importance. However, other matters are also significant. 3 Corbin, *supra* §§ 538, 549. It is important to recognize that although the writing "may be coextensive with the agreement, it is not the agreement but only evidence thereof." Murray, *supra,* 123 U.Pa.L.Rev. at 1389. Murray adds that "if the writing is normally executed absent understanding of its fine print provisions, it is less worthy as evidence of the true agreement." *Id.* at 1373. Llewellyn puts the proposition another way:

> The fine print which has not been read has no business to cut under the reasonable meaning of those dickered terms which constitute the dominant and only real expression of agreement, but much of [the writing] commonly belongs in [the contract].

Llewellyn, *The Common Law Tradition* 370 (1960). Thus, Llewellyn concludes, "any contract with boiler-plate results in *two* several contracts: the *dickered* deal and the collateral one of *supplementary* boiler-plate." *Id.* at 371 (emphasis in original).

If we continue to look at an insurance policy as a contract between the insured and insurer, the foregoing analysis compels the conclusion that the problem is simply the application of the parol evidence rule. The traditional view of the law of contracts is that a written agreement adopted by the parties will be viewed as an integrated contract which binds those parties to the terms expressed within the four corners of the agreement. Thus, the parties may not vary or expand the agreement by introducing parol evidence to show understandings or antecedent agreements which are in some way contrary to the terms of the contract. *Restatement (Second) of Contracts* § 215. This rule is applied with varying degrees of exactitude to insurance policies. Cases from this state reflect that attitude. *See Sparks v. Republic Nat. Life Ins. Co., supra; Isaak v. Massachusetts Indemnity Life Ins. Co.,* 127 Ariz. 581, 623 P.2d 11 (1981); *Dairyland Mutual Ins. Co. v. Andersen,* 102 Ariz. 515, 433 P.2d 963 (1967); *but see Southern Casualty v. Hughes,* 33 Ariz. 206, 263 P. 584 (1928); *Ranger Insurance Co. v. Phillips,* 25 Ariz. App. 426, 544 P.2d 250 (1976).

When faced with harsh or illogical results, such as those produced by application of the parol evidence rule to most insurance contracts, the law usually reacts by recognizing exceptions which permit courts to avoid injustice. The ambiguity rule is, of course, one of those exceptions. Others, advanced with varying success, are the doctrines of waiver and estoppel. In our view, a better rationale is to be found by application of *established principles of contract law.* In so doing, however, we must remember that the usual insurance policy is a special kind of contract. It is largely adhesive; some terms are bargained for, but most terms consist of boilerplate, not bargained for, neither read nor understood by the buyer, and often not even fully understood by the selling agent. In contracts, as in other fields, the common law has evolved to accommodate the practices of the marketplace. Thus, in insurance law, as in other areas of contract law, the parol evidence rule has not been strictly applied to enforce an illusory "bargain" set forth in a *standardized contract* when that "bargain" was never really made and would, if applied, defeat the true agreement which

was supposedly contained in the policy. *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. at 537, 647 P.2d at 1135. *See also Zuckerman v. Transamerica Insurance Co.*, 133 Ariz. at 144, 650 P.2d at 446.

■ *Sparks* and *Zuckerman* reflect this court's attempt to bring some degree of logic and predictability into the field of insurance. What is needed, however, is recognition of a general rule of contract law. We believe that the current formulation of the *Restatement (Second) of Contracts* contains a workable resolution of the problem. The Restatement approach is basically a modification of the parol evidence rule when dealing with contracts containing boiler-plate provisions which are not negotiated, and often not even read by the parties.

Standardized Agreements

(1) Except as stated in Subsection (3), where a party to an agreement signs or otherwise manifests assent to a writing and has reason to believe that like writings are regularly used to embody terms of agreements of the same type, he adopts the writing as an integrated agreement with respect to the terms included in the writing.

(2) Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.

(3) Where the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement.

*Restatement (Second) of Contracts* § 211. We believe that the comments to this section of the Restatement support the wisdom of the rule formulated. Comment (a) points out that standardization of agreements is essential

to a system of mass production and distribution. Scarce and costly time and skill can be devoted to a class of transactions rather than to details of individual transactions. . . . Sales personnel and customers are freed from attention to numberless variations and can focus on meaningful choice among a limited number of significant features: transaction-type, style, quantity, price, or the like. Operations are simplified and costs reduced, to the advantage of all concerned.

Subsections (1) and (2) of § 211 reflect the reality of the marketplace. Thus, those who make use of a standardized form of agreement neither expect nor desire their customers "to understand or even to read the standard terms." *Id.* comment (b). On the other hand, customers "trust to the good faith of the party using the form [and] . . . understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose." *Id.* The limitations that the law may impose are that standard terms

may be superseded by separately negotiated or added terms (§ 203), they are construed against the draftsman (§ 206), and they are subject to the overriding obligation of good faith (§ 205) and to the power of the court to refuse to enforce an unconscionable contract or term (§ 208).

*Id.* comment (c).[7]

Subsection (3) of § 211 is the Restatement's codification of and limitation on the "reasonable expectation" rule as applied to standardized agreements. The comment reads as follows:

Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation. . . . [An insured] who adheres to the [insurer's] standard terms does not assent to a term if the [insurer] has reason to believe that the [insured]

---

**7.** The Section numbers in this quote refer to sections in the Restatement (Second) of Contracts.

would not have accepted the agreement if he had known that the agreement contained the particular term. Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view. This rule is closely related to the policy against unconscionable terms and the rule of interpretation against the draftsman.

*Id.* comment (f). We believe the analysis contained in the comments to the cited sections in the Restatement is a sensible rationale for interpretation of the usual type of insuring agreement.[8]

■ This treatment of insurance law is neither radical nor new. All that is new in the "changed" Restatement is the articulation of the rule. Some cases long ago recognized the underlying principles. For instance, in *Southern Casualty v. Hughes,* 33 Ariz. 206, 263 P. 584 (1928), we held that an insurer was bound to provide coverage contrary to the express terms of the policy because of the oral representations which had been made with regard to that coverage. In another case, we looked to the insured's expectation that, at renewal, the insurer would not vary the policy terms and held the insurer bound by the terms of the old policy, despite the fact that a new one had been provided and presumably the parties had made a new "bargain" as set forth in the four corners of the new document. *Lumbermen's Insurance Co. v. Heiner,* 74 Ariz. 152, 245 P.2d 415 (1952).

In *Zuckerman, supra,* we refused to give effect to a special statute of limitations which was contained in the policy conditions and which had not been bargained for because we found it oppressive when used as a method to avoid payment of just claims. In *Sparks, supra,* we avoided the integration/parol evidence rule by holding that since the insured had not been given an opportunity to read the policy, an ambiguity could be found by considering an advertising brochure given to the insured before the contract was made. Ordinarily, of course, the making of an integrated contract discharges "prior agreements to the extent that it is inconsistent with them." *Restatement (Second) of Contracts* § 213.

Thus, not all the cases have been decided on the "four corners" hypothesis. Missing has been the articulation or formulation of some general rule to explain results of many past cases and to provide a pragmatic, honest approach to the resolution of future disputes. Hopefully, the adoption of § 211 of the Restatement as the rule for standardized contracts will provide greater predictability and uniformity of results—a benefit to both the insurance industry and the consumer.

In adopting this rule, we do not create a special field of contract law, we merely adopt a rule of integration which recognizes the method by which people do business. Indeed, the law pertaining to non-standardized, negotiated contracts long ago began to move in the same direction. "Ordinary" contract law now recognizes that an agreement may be "partially integrated," or "completely integrated," depending upon "the degree to which the parties intended the writing to express their agreement." E. Farnsworth, *Contracts,* § 7.3 at 452 (1982). The relationship between the

---

8. It would, of course, also be applicable to other transactions handled in a similar manner. We note, for example, that contracts for transport by rail, airline or bus; for rental of cars, trucks and other equipment; credit card and charge account "rules" and terms; bills of lading, invoices and many other commercial documents are "sold" or "made" in the same manner as

most insurance policies. On the other hand, there are some insurance transactions which are still the product of negotiation which includes the terms of the policy. Such contracts are not affected by § 211 because it applies only to standardized agreements such as the average automobile, general liability, or fire policy.

degree of integration and the application of the parol evidence rule has been the subject of much scholarly controversy. The authors of the leading contract treatises, Williston and Corbin, present differing views. "The point in dispute is whether the fact that the writing appears on its face to be a complete and exclusive statement of the terms of the agreement establishes conclusively that the agreement is completely integrated." Farnsworth, *supra* at 455. If it does, Williston would restrict interpretation to the four corners of the document. *Id.; See 4 Williston on Contracts* §§ 600A, 629, 633 (3d ed. 1961). Corbin argues that account should always be taken of all the surrounding circumstances to determine the extent of the integration *and* the interpretation of the agreement. Farnsworth, *supra* at 456; 3 Corbin, *supra*, § 582.

. ■ Recent decisions, the Uniform Commercial Code and the Restatement (Second) of Contracts have all favored Corbin's view. Farnsworth, *supra* at 453. *See also* Braucher, *Interpretation and Legal Effect in the Second Restatement of Contracts,* 81 Colum.L.Rev. 12 (1981). Arizona has followed the modern trend and adopted the Corbin view. In *Smith v. Melson,* 135 Ariz. 119, 121, 659 P.2d 1264, 1266 (1983) we stated that a "contract should be read in light of the parties' intentions as reflected by their language and in view of all the circumstances." We held that "the purpose of an agreement is to be divined from the entire instrument and the surrounding circumstances and not from the label the parties attach to it." *Id.* at 122, 659 P.2d at 1267. In Arizona, therefore, the interpretation of a negotiated agreement is not limited to the words set forth in the document. Evidence on surrounding circumstances, including negotiation, prior understandings, subsequent conduct and the like, is taken to determine the parties' intent with regard to integration of the agreement; once the court is able to decide what constitutes the "agreement," the evidence may be used to interpret the meaning of the provisions contained in the agreement. This method obtains even though the parties have bargained for and written the actual words found in the instrument. *Smith v. Melson, supra;* 3 Corbin, *supra,* § 582 at 455–57; 4 Williston, *supra,* § 629 at 918.

It would be anomalous, indeed, to follow this view for contracts with bargained terms but to cling to the rejected rule in cases involving standardized form contracts. It would be even more anomalous if reasonable expectations induced by promises or conduct of a party are to be considered in determining integration or interpreting the words of a negotiated boilerplate agreement but disregarded when dealing with boilerplate, so that regardless of intent or even actual agreement, the parties are bound by provisions that were never discussed, examined, read or understood.

The general rule of contract interpretations adopted by the Restatement and based on Corbin's viewpoint is a modern view which takes into account the realities of present day commercial practice. See, Trakman, *Interpreting Contracts: A Common Law Dilemma,* 59 Canadian Bar Review 241 (1981). The rule which we adopt today for interpretation of standardized contracts recognizes modern commercial practice by business entities which use automated equipment to effect a large volume of transactions through use of standardized forms. It parallels the general rule which applies to all contracts by attempting to discover the intent of the parties, in so far as intent existed, and attempts to ascertain the real agreement so far as it was expressed or conveyed by implication. However, it recognizes that most provisions of standardized agreements are not the result of negotiation; often, neither customer nor salesperson are aware of the contract provisions. The rule adopted today recognizes reality and the needs of commerce; it allows businesses that use such forms to write their own contract. It charges the customer with knowledge that the contract being "purchased" is or contains a form applied to a vast number of transactions and includes

terms which are unknown (or even unknowable); it binds the customer to such terms. However, the rule stops short of granting the drafter of the contract license to accomplish any result. It holds the drafter to good faith and terms which are conscionable; it requires drafting of provisions which can be understood if the customer does attempt to check on his rights; it does not give effect to boilerplate terms which are contrary to either the expressed agreement or the purpose of the transaction as known to the contracting parties. From the standpoint of the judicial system, the rule recognizes the true origin of standardized contract provisions, frees the courts from having to write a contract for the parties, and removes the temptation to create ambiguity or invent intent in order to reach a result.

The rule does not set a premium on failure to read. Those who negotiate their transactions will be held to the same rules as have previously obtained with regard to the duty to read. The rule which we adopt applies to contracts (or parts of contracts) made up of standardized forms which, because of the nature of the enterprise, customers will not be expected to read and over which they have no real power of negotiation.[9]

To apply the old rule and interpret such contracts according to the imagined intent of the parties is to perpetuate a fiction which can do no more than bring the law into ridicule. To those troubled by the change in the law, we point out that the fundamental change occurred first in business practice. The change in legal analysis does no more than reflect the change in methods of doing business. To acknowledge standardized contracts for what they are—rules written by commercial enterprises—and to enforce them as written, subject to those reasonable limitations provided by law, is to recognize the reality of the marketplace as it now exists, while imposing just limits on business practice. These, we think, have always been the proper functions of contract law.

We turn, then, to the facts of this case. We have adopted a rule of law which, in proper circumstances, will relieve the insured from certain clauses of an agreement which he did not negotiate, probably did not read, and probably would not have understood had he read them. Does this case present a proper circumstance? If so, by what process is this to be accomplished? How is the restatement rule to be given effect?

## EQUITABLE ESTOPPEL

■ The elements of estoppel are "conduct by which one ... induces another to believe ... in certain material facts, which inducement results in acts in reliance thereon, justifiably taken, which cause injury...." *Sahlin v. American Casualty Company of Reading*, 103 Ariz. 57, 59, 436 P.2d 606, 608 (1968) (quoting *Builders Supply Corp. v. Marshall*, 88 Ariz. 89, 94, 352 P.2d 982, 985 (1960)).

The majority rule is considered to be "that the doctrines of waiver and estoppel are not available to bring within the coverage of an insurance policy risks not cover-

---

**9.** It cannot be seriously contended, for instance, that airline companies, car rental agencies, and the like expect their customers to line up, demand copies of the various instruments which set forth the "contract" and require explanations of the various terms. The usual "contract" for air transportation provides an example; it begins as follows:

Conditions of contract

As used in this contract "ticket" means this passenger ticket and baggage check, of which these conditions and the notices form part, "carriage" is equivalent to "transportation", "carrier" means all air carriers that carry or undertake to carry the passenger or his bag-

gage hereunder or perform any other service incidental to such air carriage, "Warsaw Convention" means the convention for the unification of certain rules relating to international carriage by air signed at Warsaw, 12th of October, 1929, or that convention as amended at the Hague, 28th September, 1955, whichever may be applicable.

Uniform Passenger Ticket and Baggage Check, ATC version, printed on the back of the standard form of ticket in general use by airlines in the United States. Fortunately, we have not yet been required to interpret this contract by conjuring up some supposed intent of the passenger.

ed by its terms, or expressly excluded therefrom." Annot. 1 A.L.R.3d 1149, 1147 (1965). Indeed, the annotation lists only two jurisdictions (Idaho and South Dakota) that clearly take the contrary view. *Id.* at 1150–51. However, since the annotation was published several other states have adopted the view that estoppel may be available under certain circumstances. *Harr v. Allstate Insurance Co.,* 54 N.J. 287, 255 A.2d 208, (1969); *King v. Travelers Ins. Co.,* 84 N.M. 550, 505 P.2d 1226 (1973); *Hunter v. Farmers Insurance Group,* 554 P.2d 1239, 1243 (Wyo.1976).

█ In adopting the "minority rule" the New Jersey Supreme Court examined the "decisions holding estoppel not available to broaden coverage" and found "many of the cases so stating are confusing ...." *Harr,* 54 N.J. at 305, 255 A.2d at 218. The reason for this is that "in many cases where estoppel is held unavailable the necessary elements have not been made out anyway." *Id.* This conclusion is particularly applicable to the Arizona cases cited by appellee in support of the proposition that Arizona follows the majority rule. *Parks v. American Casualty Company of Reading,* 117 Ariz. at 342, 572 P.2d at 804; *Sellers v. Allstate Ins. Co.,* 113 Ariz. at 422, 555 P.2d at 1116; *See also Connolly v. Great Basin Ins. Co.,* 6 Ariz.App. 280, 431 P.2d 921 (1967); *but see Sparks v. Republic Nat. Life Ins. Co.,* 132 Ariz. at 536 n.1, 647 P.2d at 1134 n.1. The case at bench, then, is the first Arizona case which has clearly and properly raised the issue of estoppel. The "majority rule" is eroding. *See* 16C Appelman, *supra,* § 9166 at 153–58, § 9167 at 162–65 (1981). Given our view of contract theory and the policy considerations in *Sparks* and *Zuckerman,*

there are strong reasons to recognize a rule which allows an insured to raise the issue of estoppel to establish coverage contrary to the limitations in the boiler-plate policy when the insurer's agent had represented the coverage as greater than the language found in the printed policy. The fact that the insured has not read the insurance policy "word for word" is not, as a matter of law, an absolute bar to his theory of estoppel. *See Northwestern National Ins. Co. v. Chambers,* 24 Ariz. 86, 94, 206 P. 1081, 1084 (1922) (disapproving of the rule of *caveat emptor* in insurance transactions). It is for the trier of fact to determine whether, under circumstances such as this, the appellant had a duty to read. *Heiner,* 74 Ariz. at 156, 245 P.2d at 418. *See generally,* Macaulay, *Private Legislation and the Duty to Read—Business Run by IBM Machine, the Law of Contracts and Credit Cards,* 19 Vand.L.Rev. 1051, 1051–69 (1966).

█ The facts of the case at bench are within the exception to interpretation contained in subsection (3) to *Restatement (Second) of Contracts,* § 211. The coverage limits for lessees were separately negotiated. The standard boilerplate definition of the word "insured", excluding lessees, was not bargained for, not written by and not read by the parties. It need not be allowed to "undercut the dickered deal." We therefore adopt the rationale of the New Jersey Supreme Court in *Harr* [10] and recognize equitable estoppel as a device to prevent enforcement of those boiler-plate terms of the insurance contract which are more limited than the coverage expressly agreed upon by the parties. As applied to this case, the rule adopted means simply that if the fact finder determines that Dar-

---

10. ... where an insurer or its agent misrepresents, even though innocently, the coverage of an insurance contract or the exclusions therefrom, to an insured before or at the inception of the contract, and the insured reasonably relies thereupon to his ultimate detriment, the insurer is estopped to deny coverage after a loss on a risk or from a peril actually not covered by the terms of the policy. The proposition is one of elementary and simple justice. By justifiably relying on the insurer's

superior knowledge, the insured has been prevented from procuring the desired coverage elsewhere. To reject this approach because a new contract is thereby made for the parties would be an unfortunate triumph of form over substance.
*Harr,* 54 N.J. at 306–07, 255 A.2d at 218. See also *Kramer v. United Services Auto Ass'n,* 436 So.2d 935, 937 (Fla.App.1983) and *Peninsular Life Ins. Co. v. Wade,* 425 So.2d 1181 (Fla.App. 1983) (both quoting this language from *Harr*).

ner and Doxsee did agree upon lessee's coverage in limits of 100/300, and if, by justifiably relying on Doxsee's assurances or for some other justifiable reason, Darner was unaware of the limitation in the umbrella policy, Universal would be estopped to assert the definitional exclusion which eliminates Darner's lessee from the class of persons insured. Thus, we do not limit the assertion of estoppel by the insured to cases in which an insurance policy has not been delivered prior to the loss.[11] Since the parol evidence rule does not necessarily prevent establishing the true agreement, estoppel may apply where, from the nature of the transaction, the fact finder is able to determine that the insured acted reasonably in not reading the particular provision of the policy.[12]

## REFORMATION

█ "Where reformation is sought because of the mistake of one party only, it is essential that fraud or inequitable conduct be found in the other." *Korrick v. Tuller*, 42 Ariz. 493, 498, 27 P.2d 529, 531 (1933). "Inequitable conduct which would justify reformation when there is unilateral mistake takes the form of knowledge on the part of one party of the other's mistake." *Isaak v. Massachusetts Indemnity Life Ins. Co.*, 127 Ariz. at 584, 623 P.2d at 14. "Ordinarily, the terms of the policy should control, although the statement of an agent well may ground an action for reformation." 16C Appleman, *supra*, § 9167 at 165. Moreover, one whose inequitable conduct has caused the instrument to be "accepted with provisions at variance with the true agreement may not set up the other party's negligence in failing to read the instrument. * * *" *Lane v. Mathews*, 75

Ariz. 1, 5, 251 P.2d 303, (1952) (quoting 76 C.J.S., Reformation of Instruments, § 46 at 400).

█ According to Universal, Darner was simply mistaken about the extent of coverage under his umbrella policy. Darner avers that, if so, this resulted from Doxsee's failure to properly explain the terms of the policy. There is no dispute that Darner told Doxsee he was concerned about having only 15/30 coverage for lessees. There is clearly a factual dispute regarding Doxsee's appreciation of Darner's concern. Arguably, Doxsee had knowledge of Darner's "mistaken" understanding of the agreement. Thus it may be that "the true contract of insurance in this case ... arose out of the oral agreement between the parties and not that as evidenced by the written policy." *Ranger Insurance Co. v. Phillips*, 25 Ariz.App. 426, 430, 544 P.2d 250, 254 (1976); *See also A.I.D. Ins. Services v. Riley*, 25 Ariz.App. 132, 135, 541 P.2d 595, 598 (1975).

The same disputed material facts which demand trial on the merits regarding the estoppel remedy can also be marshalled under the reformation theory. Under the provisions of *Restatement (Second) of Contracts*, § 211 the form provisions at variance with the bargained deal or contrary to the dominant purpose of the transaction are "not part of the agreement." They should be eliminated, so that the bargains made will be realized. The written agreement may be reformed to state the true agreement. Accordingly, summary judgment on reformation was error.

## NEGLIGENCE

Universal concedes that Doxsee "was an agent of Universal Underwriters rather

---

11. *General Ins. Co. v. Truly Nolen of America*, 136 Ariz. 142, 143, 664 P.2d 686, 689 (App.1983) is disapproved insofar as contrary to this principle.

12. The jury could find, for instance, that the insured acted reasonably in failing to read standard boilerplate which defined insured—particularly in view of Doxsee's assurances regarding the limits. On the other hand, if the limit problem is clearly disclosed in the declaration page, and Darner also failed to read that, the fact

finder might find that estoppel was not applicable under the principles of § 211. The key question is whether the clause or provision was one bargained for and agreed upon, in which case it is enforced as written and interpreted, or whether it was part of the standardized form which the customer would not ordinarily be expected to read, in which case it would be enforced as written, subject to the constraints and limitations of § 211.

than [Darner Motors]". Universal continues that "[w]hile this does not mean that Doxsee owed no duties to [Darner], it does mean that Doxsee did not owe [Darner] the special fiduciary duties owed to an agent's principal, as [Darner] apparently contends. This question of Doxsee's status is important." As a general statement of the law, Universal is correct. Doxsee cannot be held accountable as Darner's fiduciary. Universal and Doxsee are also correct in noting that Doxsee did owe some duty to Darner Motors and that Doxsee's status as an insurance agent is important in determining that duty. Essentially, the issue is not a question of agency law but of tort law.[13] What duty does a licensed insurance agent owe to a client or customer?

The duty is concisely stated by the Supreme Court of Hawaii: "An insurance agent owes a duty to the insured to exercise reasonable care, skill and diligence in carrying out the agent's duties in procuring insurance." *Quality Furniture v. Hay*, 61 Hawaii 89, 595 P.2d 1066, 1068 (1979). *See also Riddle-Duckworth v. Sullivan*, 253 S.C. 411, 420–425, 171 S.E.2d 486, 490–92 (1969); *Kenyon v. Larsen*, 205 Neb. 209, 217, 286 N.W.2d 759, 764 (1980) (agent has the duty to advise his client as to the insurance he wants, "including the limits of the policy to be issued"); *Elliot v. Ron Dawson & Associates (1972) Ltd.*, 139 D.L.R. (3d) 323 (Brit.Col.S.Ct. 1982); Annot., 72 A.L.R. 3d 747, 758–63 (1976); 43 Am.Jur.2d §§ 138, 140–41 (1982).

"Public policy supports the adoption of rules which tend to discourage negligence or misconduct in the insurance industry," 19 Appelman, *supra*, § 10557 at 632 (1982), and most states, including Arizona, have enacted statutes prohibiting certain conduct of insurers and insurance agents. *Id.;*

*see* A.R.S. 20–443; *Sparks*, 132 Ariz. at 540; 647 P.2d at 1138. The rationale for a cause of action based on the negligence of an insurance agent has been stated by the Supreme Court of Idaho:

A person in the business of selling insurance holds himself out to the public as being experienced and knowledgeable in this complicated and specialized field. The interest of the state that competent persons become insurance agents is demonstrated by the requirement that they be licensed by the state, I.C. § 41–1030 [§ 20–287, 7 A.R.S.]; pass an examination administered by the state, I.C. § 41–1038 [§ 20–292, 7 A.R.S.]; and meet certain qualifications, I.C. § 41–1034 [§ 20–290, 7 A.R.S.]. An insurance agent performs a personal service for his client, in advising him about the kinds and extent of desired coverage and in choosing the appropriate insurance contract for the insured. Ordinarily, an insured will look to his insurance agent, relying, not unreasonably, on his expertise in placing his insurance problem in the agent's hands. See discussion in *Riddle-Duckworth, Inc. v. Sullivan*, 253 S.C. 411, 171 S.E.2d 486 (1969). When an insurance agent performs his services negligently, to the insured's injury, he should be held liable for that negligence just as would an attorney, architect, engineer, physician or any other professional who negligently performs personal services.

*McAlvain v. General Ins. Co. of America*, 97 Idaho 777, 780, 554 P.2d 955, 958 (1976). *See also French Market Plaza Corp. v. Sequoia Ins. Co.*, 480 F.Supp. 821 (E.D.La. 1979).

---

**13.** It is possible, of course, to argue that recovery under the estoppel or reformation theories on the one hand and under the negligence or fraud theories on the other, are inconsistent. Ordinarily, this would be true. Inconsistent theories may be alleged, Rule 8(f), Ariz.R.Civ.P., 17 A.R.S. It is possible, also, that the jury could find against Darner with respect to the construction of the insurance policy while still finding for Darner on the negligence count. For in-

stance, the jury might find that Doxsee did explain the policy provisions to Darner but that Darner failed to understand the explanation. The jury might, therefore, find the principles set forth in Restatement § 211 inapplicable, but find, also, that Doxsee was negligent in failing to adequately advise Darner with respect to the type of coverage which he should have obtained for his lessees.

■ The principle involved here is simply that a person who holds himself out to the public as possessing special knowledge, skill or expertise must perform his activities according to the standard of his profession. If he does not, he may be held liable under ordinary tort principles of negligence for the damage he causes by his failure to adhere to the standard. *See* W. Prosser, *Law of Torts* § 32, at 161–62 (4th ed. 1971). Proof of the standard in this type of case may require expert testimony at trial.[14]

Assuming that Doxsee breached his duty to Darner, Universal and Doxsee further argue that they are entitled to summary judgment because, as a matter of law, "[a]ppellant's duty to read the policies, and its acceptance of them bars any action against the agent as well as the principal." *Nowell v. Dawn-Leavitt Agency*, 127 Ariz. 48, 617 P.2d 1164 (App.1980) is cited for this proposition. *Nowell* limited liability of an insurance agent to situations where there was separate consideration for his advice or where he appreciated there was a duty to give his client comprehensive advice. *Id.* at 52, 617 P.2d at 1168. The first ground confuses contract and tort principles and is irrelevant to the allegation of negligence. The second ground was construed in excessively narrow fashion by the *Nowell* court:

> We are a nation which prides itself in its literacy. With our courts straining to dispose of a mass of litigation, including a greatly increased increment in the malpractice field in situations where it may not be in the economic self-interest of the defendant to impart as much information as possible to his client, we fail to see that sound policy requires that we reinforce the typical insurance agent's self-interest with a potential legal liability.

*Id.*

■ We are a nation which also prides itself on a tradition of allowing a person to rely upon the words of another who, be-cause of special knowledge, undertakes to act as an advisor. If an agent has an economic self-interest in imparting information, sound policy does require that the agent's duty to speak without negligence be reinforced by basic tort principles inherent in the common law. *See Restatement (Second) of Torts*, § 552 (1977). As we have recently stated in another context, "no person and no group should be given special privileges to negligently injure others without bearing the consequences. We do not favor special rules of tort nonliability ...." *Ontiveros v. Borak*, 136 Ariz. 500, 512, 667 P.2d 200, 212 (1983). Insurance agents cannot be considered as professional without assuming the responsibilities and duties generally associated with such a status. One of those responsibilities is to exercise that degree of care ordinarily to be expected from others in their profession.

■ In South Dakota an insured has a right to rely on the expertise and representations of an insurance agent and "an insured is not contributorily negligent in failing to read his insurance policy." *Moore v. Kluthe & Lane Ins. Agency, Inc.*, 89 S.D. 419, 430–31, 234 N.W.2d 260, 266. We believe that the "contributory negligence" question here turns on the reasonableness of an insured's failure to read the policy and his reliance on statements made by the agent. It is, therefore, a question for the trier of fact. Ariz. Const. Art. 18, § 5; *See also Anderson v. Dairyland Ins. Co.*, 97 N.M. 155, 637 P.2d 837, 839 (1981); *Precision Castparts Corp. v. Johnson & Higgins of Oregon, Inc.*, 44 Or.App. 739, 607 P.2d 763 (1980); *Elliot v. Ron Dawson Associates (1972) Ltd.*, *supra*, Restatement (Second) of Torts, §§ 552, 552A and § 552C, comment (g).

### FRAUD

■ In order to establish a cause of action based on fraud a person must estab-

---

14. We take note that Doxsee was not an independent agent, but was employed by Universal. We do not imply, by this opinion, that the standard of care is the same. It may be that "com-pany agents" are held to a somewhat lower standard than "independent agents"; this, of course, is a matter of evidence.

lish each of the nine elements set out in *Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 500, 647 P.2d 629, 631 (1982) by sufficient evidence. The court of appeals sustained summary judgment on this count in the briefest terms quoting from *Apolito v. Johnson*, 3 Ariz.App. 232, 236, 413 P.2d 291, 295 (1966). *Apolito* held that "a person's negligence in failing to read a document which he was requested to sign and which he had never seen before precludes recovery on the basis of fraud, there being no right to rely on the representations concerning the document." *Id.* In *Apolito* there was no fraud because there was no representation of fact, merely "representations by one layman to another as to the meaning or legal effect of the terms of a written agreement." *Id.* In the case at bench, if Darner is to be believed, Doxsee did misrepresent the actual terms of the umbrella policy. *Apolito* is therefore distinguishable. The court of appeals also cites *Mutual Benefit Health & Accident Association v. Ferrell*, 42 Ariz. 477, 487, 27 P.2d 519, 523 (1933). In that case the court stated:

> *What is common prudence and diligence varies in accordance with the circumstances of the case,* but it is generally held that, when a party has equal opportunity to read and examine a contract with the other party, it is his duty to do so, and, if he fails, he will not be permitted to avoid it on the ground that he did not read it or supposed it was different in its terms from what it really was.

*Id.* (emphasis added.) However, the *Ferrell* court also discussed two instances in which the "duty to read" might be excused on the basis of false representations:

> One is where it is admitted whether by the pleadings or by the presence or absence of evidence on behalf of the party alleged to have committed the fraud that such fraud was in fact committed. [citation omitted] The other is where there are *special* and peculiar *circumstances justifying the signer in relying upon the representations,* such as a fiduciary relation between the parties, that the

*signer* was ... unable to understand the agreement and the like.

*Id.* at 487–88, 27 P.2d at 523 (emphasis added).

In an earlier case, *Smith v. Mosbarger*, 18 Ariz. 19, 156 P. 79 (1916) the court stated:

> [w]hen fraud or mistake is alleged as a ground for avoiding the stipulations of a contract, it must be made to appear, not that the party has made a bad bargain but that he has been wrongfully and fraudulently induced to execute something contrary to what he thought to be his contract.

*Id.* at 24, 156 P. at 80.

It is important to realize that the older Arizona cases from which we quote contemplated a traditional contracts theory framework, *i.e.*, parties of equal bargaining power reducing a negotiated bargain to a writing attested to by their signatures. Nevertheless, there were narrow exceptions to the duty to read. As the times have changed and mass contracts (standardized forms) have replaced negotiated agreements, the law has remained relatively unchanged. Indeed, cases such as *Apolito* and *Nowell* seem designed to make the "duty to read" principle even more inflexible than in the past. To further rigidify that principle under the facts of this case is unwise.

In the case at bench we cannot say, as a matter of law, that Darner's duty to read may not be excused if the facts in dispute are resolved in Darner's favor. Moreover, while Doxsee had no fiduciary duty to Darner, he did have the duty to act with the care and expertise of one licensed to sell insurance in this state; Darner may have relied upon Doxsee. While we may view the evidence in the depositions as especially weak regarding a claim of fraud, we cannot say that the allegations and supporting testimony about the factual disputes are wholly without merit. Because the three other claims are so closely entwined with the

fraud theory we consider it preferable that this claim also be allowed at trial.[15]

For the foregoing reasons we vacate the decision of the court of appeals and reverse the trial court's summary judgment as to the counts of equitable estoppel, reformation of the contract, negligent misrepresentation and fraud. Because of this disposition of the substantive matters, the court of appeals' award of attorney's fees is vacated.

GORDON, V.C.J., and HAYS, J., concur.

CAMERON, Justice, specially concurring.

I concur in the majority decision and opinion and write only because I believe the dissent incorrectly characterizes the opinion and could lead to a misinterpretation of the holding of the majority.

First, I do not believe that the opinion adopts "virtually every minority position." The majority opinion adopts the rule of the Restatement (Second) of Contracts, § 211 (1981), and applies to form provisions the same general rules of contract law which we have recently applied to all contracts. *Smith v. Melson*, 135 Ariz. 119, 659 P.2d 1264 (1983).

Second, today's decision does not make the contents of insurance policies or other contracts irrelevant. The majority opinion specifically indicates that the terms contained in standardized forms will continue to be enforced as written. Today's opinion merely articulates the limits of what will be enforced. Most, if not all, of those limits have long been recognized. For instance, we previously have implied a covenant of good faith in all contracts. *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866 (1981). We have always interpreted ambiguous terms against the drafter. *Sparks v. Republic National Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982); *Germania Fire Ins. Co. v. Bally*, 19 Ariz. 580, 591, 173 P. 1052, 1057 (1918).

Neither have we enforced unconscionable terms which were the product of over-reaching. *See Seekings v. Jimmy GMC of Tucson, Inc.*, 130 Ariz. 596, 602, 638 P.2d 210, 216 (1982).

Third, the majority opinion does not reward "ignorance of the contents of the document." It applies only to the type of contract which, because of the nature of the transaction, the particular customer was not or should not have been expected to read. Customers are still charged with knowledge and understanding of the forms, even when they do not read them. The majority opinion, then, does not confer on "sophisticated businessmen" any absolute right not to read the policy. Whether this is a transaction in which the consumer (Darner) was not expected to read the policy (and thus one to which the rule applied by § 211 is applicable) is a question to be decided at trial. Admittedly, the majority opinion recognizes that in most insurance transactions and many others involving standardized forms, the "boilerplate" will probably neither be read nor understood. Those terms, however, are still enforceable unless the seller should know that they would not be acceptable. *See* Restatement (Second) of Contracts, § 211(3) (1981).

The impact of the day's decision is merely to formulate the rules of construction for standardized contracts. These rules do not allow interpretation on the basis of "impression or imagination" of the consumer. Only those reasonable expectations which are induced by the words or conduct of the parties should be considered. 1 Corbin, Contracts, § 1 at 2 (1983).

Construction and interpretation of form contracts is no innovation. For years we have interpreted such contracts by reference to the "intent of the parties," even though the parties may not have demonstrated any intent with respect to the terms contained in the printed form provisions. Through today's decision we adopt a more rational set of rules as a basis for interpre-

---

15. Also, we have recognized a cause of action for negligent misrepresentation. *See Donnelly Const. Co. v. Oberg, Hunt, Gilleland,* 139 Ariz. 184, 677 P.2d 1292 (1984), *Restatement (Second) of Torts,* § 552.

tation and, in addition, subject form contracts to the same rules of construction as all others. Where there is an expressed intent, it will be given effect. Where the "boilerplate" conflicts with the intent it will not be enforced. The agent must inform the customer if there is something in the "boilerplate" that is contrary to the expressed intent of the parties or the purpose of the transaction. I believe this is good law.

HOLOHAN, Chief Justice, dissenting.

With the stated purpose of reviewing the clarity and consistency of a large body of Arizona law dealing with insurance coverage, the court by this decision proceeds to overrule the major part of past precedent on the subject. Having overruled the past precedent, the court then proceeds to adopt virtually every minority position taken by any court or text writer in the United States. The decision makes the contents of a written insurance policy irrelevant in the determination of the nature and extent of coverage. In place of the insurance policy the nature and extent of coverage will now be decided by a swearing contest between the insured and the insurance company's agents. I cannot agree with the position taken by the court and, therefore, dissent. I believe that the decision of the Court of Appeals in this case should have been approved.

The court's decision is based on the fact, at least as found by the majority, that people do not read their insurance policies, and, if they do, they don't understand them anyway. Apparently the group encompassed within the court's protection includes not only the ordinary citizen but also the successful sophisticated businessman such as the plaintiff in this case. There is no limitation on those who qualify for the benign protection of this court from what is perceived as the obfuscation created by insurance companies. Under today's decision, any person who reads his insurance policy would be a fool since it is far better to plead ignorance of the contents of the policy and claim coverage to the broadest possible extent. The matter will then be resolved by trial based on the most convincing story. The written agreement or policy is to be ignored.

Although the insurance industry is the subject of this court's current efforts to clarify and reform previous precedent, many other business organizations should feel uncomfortable about their future. I have no doubt that experience will show that few people have read their mortgages, deeds of trust, or even the escrow instructions used in various real estate transactions. Under the same rationale advanced by the court in its decision today, the various financing documents used in real estate transactions may be subject to oral modification because they have not been read, or, if read, not understood by ordinary citizens.

The mischief created by today's decision will be far-reaching. Currently the only industry affected is the insurance industry. It can be said without any exaggeration that no insurance company now operating in Arizona can be assured that the written policies currently in effect have the limitations contained in the policy. The extent of the risk which these companies thought they had undertaken is now incapable of calculation. The extent of the risk is limited only by the impressions or imagination of policyholders about the extent of their coverage.

Every insurance company in this state must review its current method of operation because today's decision will significantly affect current policies and future policies written in this state. Of course, a company may elect to cease doing business in this state because of our "enlightened" insurance law, but, hopefully, a more cautious approach may be deemed prudent until such time as appropriate legislation can be sought to establish the insurance policy as a document with some binding effect. In the interim it appears that every insurance agent will be required to do a complete review of the policy with the insured and establish some form of record to support the conclusion that the insured was

advised and understood the nature, extent and limitations of the policy which was purchased. The sale of insurance in Arizona may take on much the same formality as the taking of a plea of guilty in a criminal case. *See* Rule 17, Rules of Criminal Procedure. The agent, like the judge in a criminal case, will have to advise the insured of his rights and the consequences of taking the policy presented. Hopefully, it will not be necessary for a verbatim record to be made of the negotiations. *See* Rule 17.1(d), Rules of Criminal Procedure.

Under today's decision it appears that we have come full circle in the development of the law on contracts. Oral contracts were largely the method used in early times. To avoid the disputes which arose out of misunderstandings in oral agreements, the written contract became preferred. In modern commercial practice the written contract is not only preferred, it is essential. It is designed to eliminate disputes, and it is intended to establish some certitude in setting out the agreement of the parties. These concepts may be basic, but they are largely ignored in today's decision because an insured is not allowed to help write the contract. A debtor doesn't write the mortgage or deed of trust or most any other type of financing document, but until now the signing of the document bound the borrower to the terms of the agreement.

Whatever evil the majority is attempting to eliminate, the remedy advanced is like decapitation to cure dandruff—a cure that is far worse than the disease.