733 P.2d 649

**Stephen JOHNSON, Plaintiff/Appellant,**

v.

**David CAVAN and Karen Cavan, husband and wife, Defendants/Appellees.**

**No. 2 CA–CIV 5807.**

Court of Appeals of Arizona, Division 2, Department A.

Nov. 20, 1986.

Review Denied Feb. 24, 1987.

John L. Dillingham, Scottsdale, for plaintiff/appellant.

Storey & Ross, P.C. by Dennis I. Wilenchik and Charles M. Gale, Phoenix, for defendants/appellees.

OPINION

HATHAWAY, Chief Judge.

Appellant contests the trial court's granting of judgment, following a trial to the court, in favor of appellees solely on the basis of their lease agreement. Appellant owns and operates a bar and grill in Phoenix known as "Cruisin' Central." The premises he leases for the tavern are in a building owned by appellees. This dispute centers on whether the lease provides exclusive parking spaces for the tavern.

Appellant first was affiliated with the tavern in 1975, when he became its manager. At that time, the bar was known as "Mardi Gras" and was owned by Vault, Inc., whose chairman and president was Charles Fritsinger. Fritsinger was also the president and chairman of International Trust Center (ITC) which owned the building and leased the property to Vault, Inc.

As manager, between 1975 and 1977, appellant enforced an exclusive right to bar parking spaces by putting up "Mardi Gras only" signs on 11 spaces immediately south and four or five spaces immediately north of the bar. Appellant also installed curb markings which read, "Bar and grill parking."

In 1977, appellant purchased the tavern. He signed a lease agreement with ITC which provided:

> The Lessor ... does hereby demise and lease unto the Lessee the premises known and described as: Suites 117 through 120 in building located at 1013 North Central Avenue, Phoenix, Arizona, 85004, for the term beginning on the 1st day of December 1977, and ending on the 30th day of November 1992....

Paragraph 15 of the lease also states:

> [T]he failure of the Lessor to insist upon the strict performance of any of the conditions, covenants, terms or provisions of this lease, or to exercise any option herein conferred, shall not be considered or construed as waiving or relinquishing for the future any such conditions, covenants, terms, provisions or options, but the same shall continue and remain in full force and effect.

Additionally, paragraph 16 provides that:

> It is mutually covenanted and agreed by and between the parties hereto that this lease constitutes the entire contract between the parties and no oral agreement or statement made by said parties or either of them, or their agents, before or after the execution of this lease, shall be binding upon the parties thereto or either of them.

There is no specific mention of the parking spaces in the lease. Mr. Fritsinger, however, testified that he and appellant understood that the term "premises" as used in the lease included the 16 parking spaces that have been consistently reserved for bar use. He further testified that the enumeration of the suite numbers in the lease was for identification purposes only and was not intended to limit the extent of the demised premises.

From the time he entered into the December 1, 1977, lease until 1980, when ITC sold its interests in the property, appellant continued to utilize and enforce his right to exclusive use of the parking spaces. Moreover, appellant maintained the signs, repainted the curbs and replaced broken curb stones. When the property was conveyed in 1980, the 16 parking spaces had the same identifying characteristics they had carried since 1975. When Fritsinger sold the property to Fredrick and Yulia Hartono, he told Mr. Hartono that the lease with appellant included the 16 parking spaces and that the parking spaces were for exclusive use of the bar.

After taking possession, Hartono placed various "Hartono parking only" signs in the larger parking lot next to the bar spots. Appellant immediately confronted Hartono to enforce his rights to the parking. Thereafter, the sign next to the 11 parking spaces immediately south of the bar was changed to read: "Bar parking only." Appellant continued to maintain the parking spaces from that time until 1983 when the property was sold to the Cavans (appellees).

Cavan examined the premises several times before the final purchase and saw the "Bar parking only" signs and curb markings. He made no inquiries about the parking spaces but did, through his agent, examine appellant's lease and secure two "estoppel certificates." The second certificate provides, in part, that "[T]he Lease represents the entire agreement of the parties, and there are no amendments or other documents altering the terms of the lease except: ...." Appellant typed "none" in the space provided and signed the certificate.

After appellees purchased the property, they appropriated and fenced in the parking spots south of the building for a construction project. As a result of appellees' appropriation, appellant was cited by the City of Phoenix for violating city ordinance 601(C)(10), which requires taverns to have a certain number of parking spaces. On June 28, 1984, appellant filed a breach of

contract action seeking to enjoin appellees from appropriating certain off-street parking spaces. He later amended his complaint to include a claim for declaratory relief and temporary restraining order.

Subsequent to trial, the court held that parol evidence could not be considered to show the intent of the parties at the time the lease was executed. The court relied solely on the language in the lease, disregarding the testimony of Mr. Fritsinger and appellant, and ruled in favor of appellees. The court also held that the city ordinance did not require that the parking spots be appurtenant to the leased property. The court reasoned that the plaintiff did not prove that the spaces were of such necessity as to be considered appurtenant to the leased premises. This appeal followed.

Appellant makes three claims on appeal: (1) parol evidence is admissible to establish the intent of appellant Johnson and ITC regarding the December 1, 1977, lease as well as to interpret the scope of the demised premises; (2) because the December 1, 1977, lease limits appellant's use to a cocktail lounge, off-street parking is a necessary appurtenance; (3) appellees had actual notice of appellant's interest in off-street parking prior to acquiring the property and therefore took the property subject to appellant's interests.

Appellant's second and third claims merely reargue the facts, which we must view with all reasonable inferences therefrom in a light most favorable to the party in whose favor judgment was entered. *Paul Schoonover, Inc. v. Ram Construction, Inc.*, 129 Ariz. 204, 630 P.2d 27 (1981). Moreover, in view of our holding on the parol evidence issue, consideration of these claims is unnecessary. We therefore address the central issue of this case, which is the efficacy of the parol evidence.

Appellant claims that the trial court erred in not considering the offered parol evidence to prove that the original parties to the lease intended that it include the disputed parking spaces. Appellees respond that, because the lease does not men-

tion parking spaces and is facially unambiguous, such evidence was properly ignored. These arguments parallel the differing view of Williston and Corbin, noted by the Arizona Supreme Court in *Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 393, 682 P.2d 388, 398 (1984):

> "The point in dispute is whether the fact that the writing appears on its face to be a complete and exclusive statement of the terms of the agreement establishes conclusively that the agreement is completely integrated." [E.] Farnsworth, [*Contracts*, § 7.3], at 455. If it does, Williston would restrict interpretation to the four corners of the document. *Id.;* See 4 Williston on Contracts, §§ 600A, 629, 633 (3d ed. 1961). Corbin argues that account should always be taken of all the surrounding circumstances to determine the extent of the integration *and* the interpretation of the agreement. Farnsworth, supra, at 456; 3 Corbin, supra, § 582.

The *Darner* court noted that Arizona has adopted Corbin's view, that agreements should be interpreted in light of the contracting parties' intentions. The court then went on to state:

> In Arizona, therefore, the interpretation of a negotiated agreement is not limited to the words set forth in the document. Evidence on surrounding circumstances, including negotiation, prior understandings, subsequent conduct and the like, is taken to determine the parties' intent with regard to integration of the agreement; once the court is able to decide what constitutes the "agreement," the evidence may be used to interpret the meaing of the provisions contained in the agreement. This method obtains even though the parties have bargained for and written the actual words found in the instrument.

140 Ariz. at 393, 682 P.2d at 398. See also, *Smith v. Melson, Inc.*, 135 Ariz. 119, 659 P.2d 1264 (1983), and 3 Corbin on Contracts, § 582 (1960).

Therefore, it was incumbent upon the trial court not only to consider the words of the contract which stated that the lease agreement was for "Suites 117 through 120," but also evidence as to what the parties meant by that language. See also, Restatement (Second) of Contracts, § 214 comment *b* (1981):

> Words, written or oral, cannot apply themselves to the subject matter. The expressions and general tenor of speech used in negotiations are admissible to show the conditions existing when the writing was made, the application of the words, and the meaning or meanings of the parties. Even though words seem on their face to have only a single possible meaning, other meanings often appear when the circumstances are disclosed. In cases of misunderstanding, there must be inquiry into the meaning attached to the words by each party and into what each knew or had reason to know.

Section 201(1) of the Restatement further provides that "[w]here the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." The testimony of the original parties to the lease is unequivocal that they both assumed and intended that the parking spaces be a part of the lease. The evidence is also uncontradicted that appellees were on notice of appellant's claim of an exclusive right to use the parking spaces for his business. Appellees were obligated to inquire of appellant by what right or title he claimed possession. *Keck v. Brookfield*, 2 Ariz.App. 424, 409 P.2d 583 (1965). They could not rely solely upon the silent lease to resolve the uncertainty about parking spaces.

Appellees make much of the "estoppel certificates" signed by appellant before appellees bought the building. These provided that the lease alone was the entire agreement. The certificates do not bar appellant from enforcement of his rights. The lease did represent the entire agreement; the testimony of Mr. Fritsinger and appellant merely explained what was meant by certain terms in the lease. It was error for the court to assume the meaning of the terms of the lease without considering evidence on the parties' intent and the surrounding circumstances. See 3 Corbin on Contracts, § 582 (1960).

In view of the parol evidence and the trial court's refusal to consider it on the issue of the parties' intent at the time the lease was executed, we reverse and remand for further proceedings not inconsistent with this opinion. Appellant is awarded his attorney's fees and costs on appeal upon filing the proper affidavits pursuant to Rule 21(c), Rules of Civil Appellate Procedure, 17A A.R.S.

HOWARD, P.J., and FERNANDEZ, J., concur.