169 P.3d 127

FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, Plaintiff/Counter–Defendant/Appellee,

v.

ACTION ACQUISITIONS, LLC, an Arizona limited liability company; Free for Now, LLC, an Arizona limited liability company, Defendants/Counter–Claimants/Appellants.

Action Acquisitions, LLC, an Arizona limited liability company; Free for Now, LLC, an Arizona limited liability company, Third–Party Plaintiffs/Appellants,

v.

Capital Title Agency, Inc., an Arizona corporation, Third–Party Defendant/Appellee.

No. 1 CA–CV 06–0782.

Court of Appeals of Arizona, Division 1, Department D.

Oct. 30, 2007.

Ramras Law Offices, P.C. by David N. Ramras, Ari Ramras, Phoenix, Attorneys for Plaintiff/Counter–Defendant/Appellee.

Jackson White, P.C. by Eric M. Jackson, Christine Farnsworth, Mesa, Attorneys for Third–Party Defendant/Appellee.

Berens, Kozub, Lord & Kloberdanz, PLC by Daniel L. Kloberdanz, Scottsdale, Attorneys for Defendants/Counter–Claimants/Appellants.

## OPINION

JOHNSEN, Presiding Judge.

¶ 1 In this case we address the meaning of a form exclusion in a title insurance policy insuring title to a home that was purchased at a sheriff's sale for $3,500, less than three percent of the value of the equity in the home. After the superior court set aside the purchase because the price was so low that it "shock[ed] the Court's [conscience]," the insureds sought reimbursement from the title insurer for the fair market value of the home. We hold that coverage was barred by a form provision in the policy that excluded coverage for a loss resulting from the insured's "[f]ailure to pay value" for the title, and affirm the superior court's entry of judgment in favor of the title and title insurance companies.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 At a sheriff's sale on January 6, 2005, Action Acquisitions, LLC and Free for Now, LLC (collectively, "Purchasers") made the prevailing bid of $3,500 for a home in Gilbert that had been foreclosed upon because of unpaid homeowners' association assessments totaling about $3,000. At the time, the home was valued at between $300,000 and $400,000 and was subject to a $162,000 deed of trust.[1] After the statutory redemption period, Purchasers bought a $400,000 owner's title insurance policy ("the Policy") for the home. The Policy was issued by Capital Title Agency, Inc. ("Capital Title") and underwritten by First American Title Insurance Company ("First American").

¶ 3 On September 1, 2005, the home's previous owner filed a motion to set aside the sheriff's sale on the ground that the price Purchasers paid was so inadequate that it shocked the conscience. *See Mason v. Wilson*, 116 Ariz. 255, 257, 568 P.2d 1153, 1155

---

1. As counsel for one of appellees noted during oral argument, Purchasers took title to the home subject to the encumbrance but did not assume the debt represented by the encumbrance.

(App.1977). Upon learning of the motion, Purchasers notified First American, which retained counsel to defend Purchasers' rights. After permitting Purchasers to intervene and hearing oral argument, the superior court that heard the foreclosure action granted the motion to set aside the sale. It stated, "The Court finds the sale is grossly inadequate and it does shock the Court's [conscience]."

¶ 4 Purchasers then filed a claim under the Policy, asserting a loss of $400,000, which they alleged to be the full cash value of the home. First American denied coverage, arguing that the claim was expressly excluded under the terms of the Policy. Soon thereafter, First American filed a complaint seeking a declaratory judgment adjudicating the parties' rights and liabilities and an order holding that the Policy excluded Purchasers' claim. Purchasers filed a counterclaim against First American and a third-party complaint against Capital Title, alleging bad faith and breach of the covenant of good faith and fair dealing, fraud and fraudulent misrepresentation, negligence and negligent misrepresentation, breach of fiduciary duty and constructive fraud and consumer fraud.

¶ 5 First American moved for summary judgment. In its motion, which Capital Title joined, First American contended that coverage for the loss resulting from the order setting aside the sheriff's sale was barred by two separate express exclusions in the Policy. The first exclusion upon which First American relied ("Exclusion 4(a)") provided that Purchasers were not insured against loss resulting from "[r]isks ... that are created, allowed, or agreed to by [Purchasers]." Under the second exclusion ("Exclusion 5"), the Policy excluded loss "resulting from ... [f]ailure to pay value for [the] Title." Purchasers responded to the motion for summary judgment and filed a cross-motion on the coverage issue.

¶ 6 After hearing oral argument, the superior court granted First American and Capital Title's motion for summary judgment and denied Purchasers' cross-motion. Because it found that Purchasers "knowingly incurred the risk that the sale could be set aside," the court held Purchasers' claim was barred by Exclusion 4(a).[2] Having found that coverage was barred by the one exclusion, the court did not address First American's argument that Exclusion 5 also barred coverage. The court subsequently entered judgment in favor of First American and Capital Title on the complaint, counterclaim and cross-claim. It also granted First American and Capital Title attorney's fees of $12,500 each. Purchasers timely appealed.

## DISCUSSION

### A. Standard of Review.

¶ 7 In reviewing a summary judgment, we determine *de novo* whether genuine issues of material fact exist and whether the trial court correctly applied the law. *United Dairymen v. Schugg*, 212 Ariz. 133, 140, ¶ 26, 128 P.3d 756, 763 (App.2006). "[W]e view the facts and evidence in a light most favorable to the party against whom summary judgment was granted and draw all reasonable inferences in favor of that party." *AROK Constr. Co. v. Indian Constr. Servs.*, 174 Ariz. 291, 293, 848 P.2d 870, 872 (App. 1993). Summary judgment is appropriate "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990).

### B. The Meaning of Policy Exclusion 5.

¶ 8 Purchasers argue the superior court erred in finding that Exclusion 4(a) barred coverage of their loss resulting from the setting aside of the sheriff's sale. We do not reach that argument. Instead, we hold as a matter of law that under Exclusion 5, Purchasers were not insured against the loss

2. The court explained, "When Defendants bid $3,500 for the purchase of the subject property, which they concede had a fair market value of between $300,000 to $400,000[,] they knowingly incurred the risk that the sale could be set aside as being commercially unreasonable. While they may not have anticipated that the homeowner would take action to set aside their acquisition of the subject property, they knew that their bid was woefully inadequate."

because they failed to "pay value" for their title.[3]

▉ ¶ 9 As recited above, pursuant to Exclusion 5, Purchasers "are not insured against loss, costs, attorneys' fees, and expenses resulting from" a failure "to pay value" for their title. The parties dispute the meaning of the phrase "to pay value" within the exclusion. Purchasers argue the phrase is ambiguous and invoke the old rule that an ambiguity in an insurance policy is construed against the insurer. As First American points out, however, Arizona courts have abandoned that rule. *See Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 355, 694 P.2d 181, 185 (1984) (rule "permit[ted] the court to create its own version of the contract and to find, or fail to find, ambiguity in order to justify an almost predetermined result"). Instead, when a phrase used in an insurance policy "is susceptible to different constructions," we determine its meaning "by examining the purpose of the exclusion in question, the public policy considerations involved and the transaction as a whole." *Id.*

¶ 10 In their summary judgment papers, Purchasers argued that "value" in Exclusion 5 means any amount of consideration, so that the exclusion applied only in the event they paid nothing for the home. In support, they cited *Snap–On Tools Corp. v. Rice*, 162 Ariz. 99, 781 P.2d 76 (App.1989), which in turn relied on a former version of Arizona Revised Statutes ("A.R.S.") section 47–1201 that stated "a person gives 'value' for rights if he acquires them . . . in return for any consideration sufficient to support a simple contract."

*Id.* at 101, 781 P.2d at 78.[4] But the court in *Snap–On Tools* considered the term "value" in the context of security interests in goods rather than in the context of a real estate transaction. The same distinction, of course, applies to any support that Purchasers might hope to draw from the Uniform Commercial Code.

¶ 11 For its part, First American argues that "value" as used in Exclusion 5 means "substantial value" or "fair and adequate value" as compared to the actual cash value of the real property acquired. Noting that Exclusion 5 in substance is a form exclusion found in standard title insurance policies, First American cites a journal article for the proposition that the exclusion derives "from the basic recording act rule that, in order to enjoy the protections of the recording act, a good faith, bona fide purchaser must 'give value.'" Brian E. Davis, *Title Insurance Basics*, 520 PLI/Real 611, 637 (October–November 2005) (citing D. Barlow Burke, Jr., *Law of Title Insurance* § 3.8 (1986)). As another journal article explains, "Since title insurance is predicated on obtaining the protection under recording acts, the fact that an insured may not get this protection because he doesn't pay value is excluded." Russell W. Jordan, III, *Title Insurance 1990: The Basics and Beyond*, 358 PLI/Real 63, 79 (October–December 1990).

▉ ¶ 12 Our supreme court has held that "valuable consideration" for purposes of the recording act means something more than the amount of "value" required to constitute

---

**3.** On appeal, First American urges this court to affirm the superior court's ruling on the ground that coverage was excluded either by Exclusion 4(a) or by Exclusion 5. In its answering brief, First American designated as a cross-issue its argument that Exclusion 5 applies. *See Bryce v. St. Paul Fire & Marine Ins. Co.*, 162 Ariz. 307, 308, 783 P.2d 246, 247 (App.1989) (prevailing party may "seek to uphold a judgment in its favor for reasons supported in the record, but different from those relied on by the trial court by designating 'cross-issues'" in its brief (citing *Kalil Bottling Co. v. Burroughs Corp.*, 127 Ariz. 278, 619 P.2d 1055 (App.1980))); *see also Ness v. W. Sec. Life Ins. Co.*, 174 Ariz. 497, 502, 851 P.2d 122, 127 (App.1992) (court of appeals "may uphold a judgment on grounds different from those cited by the trial court"). Purchasers argue in their reply brief that "the issue of Exclusion No.

5 is not properly before" this court because First American did not cross-appeal from the superior court's summary judgment ruling. Purchasers' argument is unfounded. As noted, First American properly designated its argument pertaining to Exclusion 5 as a cross-issue. Moreover, the superior court did not hold that Exclusion 5 did not apply; it simply did not address the issue because it held that the claim fell within Exclusion 4(a). For that reason, there was no adverse ruling pertaining to Exclusion 5 from which First American could have appealed.

**4.** The current version of the statute no longer contains that definition—or any other definition—of "value." A.R.S. § 47–1201 (Supp. 2006).

sufficient consideration in the context of a sale of goods. *Alexander v. O'Neil,* 77 Ariz. 91, 98, 267 P.2d 730, 735 (1954) ("In the recording acts the words 'valuable consideration' are used in contradistinction from valid or sufficient consideration between vendor and purchaser."). The court in *Alexander* observed that it is "well settled that a nominal consideration does not constitute a valuable consideration within the meaning of the recording statute," *id.* at 99, 267 P.2d at 735, and endorsed the notion that payment of "a present equivalent" "constitutes *value* as that term is understood" in the act, *id.* at 96, 267 P.2d at 733. Put differently, purchasers who acquire property for a grossly inadequate price are not bona fide purchasers for value. *United States v. West,* 299 F.Supp. 661, 668 (D.C.Del.1969) ("[I]t is the general rule that a person who purchases property for grossly inadequate consideration is not a bona fide purchaser."); *McAnally v. Panther,* 26 S.W.2d 478, 480 (Tex.Civ.App.1930) ("The rule is well settled that, where the price is grossly inadequate, the purchaser cannot be considered a bona fide purchaser for value.").[5]

¶ 13 As noted above, the purpose of Exclusion 5 is to bar coverage when an insured loses title for failure to pay adequate value for the property. There is logic to that proposition, and we are cited no authority in which it is said that, to the contrary, one of the purposes of a title insurance policy is to protect an insured who purchases at a sheriff's sale from the possibility that a court will invalidate the purchase for failure to pay adequate value. Thus, the purpose of the exclusion would be served by interpreting it consistently with the authorities that set out the requirements for a bona fide purchaser or that, in this context, establish when a foreclosure sale may be set aside for failure to pay adequate value.

¶ 14 As noted, in the superior court, Purchasers argued that "value" in Exclusion 5 means only "some value," such that, for example, the exclusion would apply if the check the insured wrote at the sheriff's sale were returned for insufficient funds. But by arguing that "value" effectively means "any consideration," Purchasers would render the exclusion all but meaningless. Under their reasoning, for example, although the exclusion would apply in the event of the bounced check, it would not apply if the sale were set aside because the insured paid only a dollar for the real property. We fail to see any purpose, and Purchasers offered none on summary judgment, that would be served by interpreting Exclusion 5 in such a manner.[6]

¶ 15 In the superior court, Purchasers asserted that Capital Title was aware of the price for which they acquired the home at issue.[7] Even assuming that Capital Title knew what Purchasers bid for the home, however, that provides no support for Purchasers' assertion that the Policy necessarily covered the risk that the purchase would be set aside for failure to pay adequate value. Purchasers did not argue in the superior court that Capital Title or First American represented that the Policy would provide such coverage, and the record contains no evidence of any discussion about the matter. We reject Purchasers' assertion that a title insurer that is aware of a risk necessarily agrees by issuing a policy that it will cover that risk. Indeed, the nature of title insurance is that it covers risks to title *other than* those that are specified in the policy. In this case, an equally logical inference is that an insurer that is aware of the possibility that a sale will be set aside for failure to pay value will expressly exclude coverage for that risk.

¶ 16 Public policy, another factor that the *Transamerica* case instructs us to consider,

---

5. We look to Texas authority for assistance in interpreting our recording act because our act "was adopted from the Texas statute." *Hunnicutt Constr., Inc. v. Stewart Title & Trust,* 187 Ariz. 301, 305, 928 P.2d 725, 729 (App.1996).

6. During oral argument, Purchasers' counsel suggested for the first time that "value" in the policy exclusion means "nominal value," such that the exclusion would apply only if the insured failed to pay a nominal amount for the title.

None of the relevant authorities, however, supports such a reading of the exclusion.

7. Although the affidavit Purchasers relied on for that assertion arguably lacked foundation, Capital Title did not dispute Purchasers' assertion that it was aware of both the estimated fair market value of the home and the amount Purchasers paid for it.

also weighs against Purchasers' interpretation of the exclusion. Purchasers argue they are in the business of bidding at sheriff's sales on homes that are foreclosed upon by homeowners' associations due to unpaid assessments. Usually (and in this case), Purchasers bid on homes without seeing them and without knowing of any liens that might encumber the properties. They asserted on summary judgment that in the three-month period surrounding the transaction at issue, they made 17 such purchases and bought title insurance from Capital Title for each of them; they had bought insurance from Capital Title for 14 other transactions during an earlier period.[8]

¶ 17 According to the evidence, Purchasers' practice is to bid only the minimum required to cover the homeowners' association liens that have been foreclosed upon. In doing business in this manner, they take a calculated risk that a purchase will be set aside for failure to pay sufficient value. According to the record in this case, homeowners for whatever reason rarely move to set aside sheriff's sales. Even if a purchase were to be set aside, however, Purchasers would be refunded the amount they bid for the home plus interest. On the other hand, Purchasers may enjoy a windfall if, as in the usual case, the sale is not challenged. In that event, depending on the condition of the home and the amount of any other encumbrances, Purchasers stand to profit handsomely if they are able to sell the home for near its full value.

¶ 18 Under Purchasers' view of Exclusion 5, however, they would be better off in many cases if the sheriff's sale is set aside. They contend that in that event the insurer would be obligated to reimburse them the full cash value of the home they lost when the sale was set aside. Indeed, Purchasers' counterclaim sought $400,000 in damages, which they contended was the value of the home they lost.[9] Under their view, without having to bother with improving the home, finding a buyer or negotiating a full-value sale, Purchasers would receive insurance proceeds equal to the full cash value of a home they had purchased for only a small fraction of that amount. We decline to countenance such an outcome, under which title insurers would insure Purchasers' hoped-for profits. *See Krohn v. Sweetheart Props., Ltd.*, 203 Ariz. 205, 210, ¶ 17, 52 P.3d 774, 779 (2002) ("Windfall profits, like those reaped by bidders paying grossly inadequate prices at foreclosure sales, do not serve the public interest and do no more than legally enrich speculators.").

■ ¶ 19 Citing *Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 682 P.2d 388 (1984), Purchasers argue the Policy was a contract of adhesion and that they reasonably expected that Exclusion 5 would not bar coverage if the sale were set aside. *See id.* at 391, 682 P.2d at 396 (customers who sign adhesion contracts "are not bound to unknown terms which are beyond the range of reasonable expectation" (quoting Restatement (Second) of Contracts § 211, cmt. f)). First American argues that this reasoning does not apply because title insurance policies frequently are negotiated and therefore are not contracts of adhesion. We need not decide that issue because even if Restatement § 211 applies, as set forth above, we find Purchasers' construction of Exclusion 5 unreasonable as a matter of law. As our supreme court said in *Darner*, "the reasonable expectation concept must be limited by something more than the fervent hope usually engendered by loss." *Id.* at 390, 682 P.2d at 395.

¶ 20 Purchasers also argue that if Exclusion 5 is construed to bar coverage under circumstances such as these, the Policy was effectively worthless to them. But the Policy provided Purchasers a wide variety of valuable coverages; for example, it would cover losses resulting from unknown easements, title defects and access impediments, among other things. The only coverage that Purchasers lost by virtue of the summary judgment is that which, as noted above, would

---

8. Purchasers offered evidence of some of their successful bids; they acquired most of the homes for bids of only $3,000 to $6,200.

9. Purchasers' damage demand apparently did not take into account the $162,000 encumbrance on the home.

have effectively guaranteed them a sizeable profit on their speculative bid at the sheriff's sale. We do not believe that the purpose of the exclusion, public policy or the transaction as a whole requires a different outcome.

## C. As Properly Interpreted, Exclusion 5 Bars Coverage.

¶ 21 Purchasers' acquisition of the home at issue was set aside in the foreclosure action because the court found the amount they paid for the home was "grossly inadequate" and so low as to "shock the Court's [conscience]." *Homecraft Corp. v. Fimbres*, 119 Ariz. 299, 580 P.2d 760 (App.1978), illustrates a like transaction in which a bidder at a foreclosure sale acquired $10,000 worth of home equity with a bid of only $623.38. The court in that case affirmed the setting aside of the sheriff's sale because the buyer had paid so little for the property that it "shock[ed] the conscience" of the trial court. *Id.* at 302, 580 P.2d at 763; *see also Krohn*, 203 Ariz. at 212, ¶ 29, 52 P.3d at 781 (citing Restatement (Third) of Property: Mortgages § 8.3 cmt. b (1997), which sets out a general rule that a foreclosure sale may be invalidated if the price paid is less than 20 percent of the fair market value, adjusted for encumbrances).

¶ 22 In our case, the home was worth between $300,000 and $400,000 and was encumbered by a $162,000 deed of trust. Purchasers paid only $3,500 for between $138,000 and $238,000 of equity; their successful bid was between 1.5 percent and 2.5 percent of the equity they acquired.

¶ 23 The court's order in the foreclosure action that the price Purchasers paid for the home was "grossly inadequate" and "shocked the Court's [conscience]" was not appealed and has become final. On that basis alone, the superior court in this case could have correctly concluded that as a matter of law, Purchasers failed to "pay value" for the home, within the meaning of Exclusion 5. *See Alexander*, 77 Ariz. at 99, 267 P.2d at 735 (purchaser must pay "a present equivalent" for purposes of recording statute); *West*, 299 F.Supp. at 668 (one who pays a "grossly inadequate" price for real property is not a bona fide purchaser); *see also Krohn*, 203

Ariz. at 214, ¶ 38, 52 P.3d at 783 (trustee's sale may be set aside if price is "grossly inadequate"); *Homecraft*, 119 Ariz. at 302, 580 P.2d at 763 (foreclosure sale may be set aside if price "is so gross as to be proof of fraud or shock the conscience of the court").

¶ 24 Purchasers cite the dissent in *Krohn* in support of their argument that even if they indisputably paid a grossly inadequate price for the home, they still are bona fide purchasers for value so as to render Exclusion 5 inapplicable. At issue in *Krohn* was a question certified by the United States Bankruptcy Court whether a trustee's sale to a party that the Bankruptcy Court labeled a bona fide purchaser could be set aside for failure to pay adequate value. As noted above, our supreme court held that the grossly inadequate price paid by the purchaser invalidated the trustee's sale.

¶ 25 The opinion in *Krohn* contains no analysis or even a mention of the legal point that Purchasers hope to draw from the dissent, which is that a buyer might pay sufficient value, for purposes of the recording act, but still have the sale set aside because the amount paid is deemed grossly inadequate. The majority did not hold that a purchaser who pays a grossly inadequate price can be a bona fide purchaser for value. To the contrary, the majority appeared to question whether, under the circumstances, the buyer was a true bona fide purchaser when it pointed out that although the purchaser "was a bona fide purchaser with respect to the dealings between" the property owner and her lender, the purchaser was "chargeable with knowledge as to the sale price." 203 Ariz. at 211, ¶ 26, 52 P.3d at 780.

¶ 26 Finally, Purchasers asserted in their summary judgment papers that Exclusion 5 "seems most suitable to apply to the situation where a purchaser fails to give the value required to validate the purchase, thus causing a defense to the transfer of the title itself." We agree, and conclude that is exactly what happened in this case. Because Purchasers paid a grossly inadequate price for title to the home, Exclusion 5 bars coverage of the loss Purchasers incurred when the purchase was set aside.

## CONCLUSION

¶ 27 For the foregoing reasons, we affirm the judgments entered against Purchasers in favor of First American and Capital Title. We grant First American's and Capital Title's requests for costs and, pursuant to A.R.S. § 12–341.01 (2003), in our discretion grant them their reasonable attorney's fees incurred in connection with the appeal upon their compliance with Arizona Rule of Civil Appellate Procedure 21.

CONCURRING: JON W. THOMPSON and PATRICIA A. OROZCO, Judges.