IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

───────────

**MAARTEN KALWAY, A MARRIED MAN DEALING WITH HIS SOLE AND
SEPARATE PROPERTY,**
*Plaintiff/Appellant,*

*v.*

**CALABRIA RANCH HOA, LLC, AN ARIZONA LIMITED LIABILITY COMPANY;
MARK A. REID AND FLORENCE J. CLARK, HUSBAND AND WIFE; EDWARD A.
PHLAUM AND DIANE LYN PHLAUM, HUSBAND AND WIFE AND AS CO-TRUSTEES
OF THE EDWARD A. AND DIANE LYN PHLAUM REVOCABLE TRUST, DATED
APRIL 10, 2017; AND STUART J. SCIBETTA, AN UNMARRIED MAN AND AS
TRUSTEE OF THE STUART J. SCIBETTA LIVING TRUST DATED APRIL 1, 2015,**
*Defendants/Appellees.*

───────────

No. CV-20-0152-PR
Filed March 22, 2022

───────────

Appeal from the Superior Court in Pima County
The Honorable Janet C. Bostick, Judge
No. C20181284
**REVERSED IN PART AND REMANDED**

Memorandum Decision of the Court of Appeals, Division Two
No. 2 CA-CV 2019-0106
Filed March 13, 2020
**VACATED**

───────────

COUNSEL:

Gerard R. O'Meara, Charles W. Wirken (argued), Gust Rosenfeld P.L.C.,
Phoenix, Attorneys for Maarten Kalway

Craig L. Cline (argued), Thompson Krone P.L.C., Tucson, Attorneys for
Calabria Ranch HOA LLC, Mark A. Reid, Florence J. Clark, Edward A., and
Diane Lyn Phlaum, The Edward A. and Diane Lyn Phlaum Revocable
Trust, Dated April 10, 2017, Stuart J. Scibetta, and The Stuart J. Scibetta

Living Trust Dated April 1, 2015

———————————

CHIEF JUSTICE BRUTINEL authored the opinion of the Court, in which VICE CHIEF JUSTICE TIMMER and JUSTICES BOLICK, LOPEZ, BEENE, and MONTGOMERY joined.[*]

———————————

CHIEF JUSTICE BRUTINEL, opinion of the Court:

¶1        In this case, we are asked to decide the extent to which a homeowners' association ("HOA") may rely on a general-amendment-power provision in its covenants, conditions, and restrictions ("CC&Rs") to place restrictions on landowners' use of their land.  Although CC&Rs are generally enforced as written, we interpret such restrictions to reflect the reasonable expectations of the affected homeowners.  Construing such provisions narrowly, as with any restrictive covenant on real property, we hold that a general-amendment-power provision may be used to amend only those restrictions for which the HOA's original declaration has provided sufficient notice.

## I.   BACKGROUND

¶2        Calabria Ranch Estates is a residential subdivision comprised of five lots located east of Tucson.  Maarten Kalway owns Lot 2, which at nearly twenty-three acres is the largest of the lots.  The remaining lots range from 3.3 to 6.6 acres.[1]  The lots are subject to CC&Rs, first recorded in the original declaration in 2015, to "protect[] the value, desirability, attractiveness and natural character of the Property," as stated in the CC&Rs' general-purpose statement.

¶3        According to the original declaration, the CC&Rs could be amended "at any time by an instrument executed and acknowledged by the [m]ajority [v]ote of the owners" under the general-amendment-power

---

[*]        Although Justice Andrew W. Gould (Ret.) participated in the oral argument in this case, he retired before issuance of this opinion and did not take part in its drafting.

[1]        Each of the five lots is owned separately except for Lots 4 and 5, which are jointly owned and together comprise 11.65 acres.

provision. A "[m]ajority [v]ote" consists of at least four of the six possible votes. Each lot is entitled to one vote, except Kalway's lot, which has two.

¶4 In January 2018, the other property owners ("Other Owners") amended the CC&Rs by majority vote without Kalway's consent or knowledge. The amendments change some definitions and add others, create new restrictions, and enact new enforcement measures against owners for violating the covenants. The new restrictions include limiting owners' ability to convey or subdivide their lots, restricting the size and number of buildings permitted on each lot, and reducing the maximum number of livestock permitted on each lot.

¶5 Kalway brought this action against Calabria Ranch and the Other Owners, seeking a declaratory judgment to invalidate the amendments to the CC&Rs. The parties filed cross-motions for summary judgment, which the superior court granted in part and denied in part. The court invalidated two sections in their entirety and partially invalidated two more sections of the amended CC&Rs. The court further found the invalid provisions severable from the rest of the CC&Rs.[2]

¶6 Kalway appealed, arguing that all the amendments are invalid without unanimous consent. *Kalway v. Calabria Ranch HOA, LLC*, No. 2 CA-CV 2019-0106, 2020 WL 1239831, at *2 ¶ 8 (Ariz. App. Mar. 13, 2020) (mem. decision). The court of appeals disagreed, affirming in a 2–1 decision. *Id.* at *1 ¶ 1. The court relied on its earlier decision in *Dreamland Villa Community Club, Inc. v. Raimey*, 224 Ariz. 42, 51 ¶ 38 (App. 2010), which required notice in the original declaration that amendments on specific issues could be imposed non-consensually. *Kalway*, 2020 WL 1239831, at *3–4 ¶¶ 12–13. Applying *Dreamland*, the court concluded Kalway acquired his lot with notice that the CC&Rs could be amended by majority vote and that the general-purpose statement in the original declaration was sufficient to provide notice of the amendments. *Id.* at *4 ¶¶ 14–16. Judge Brearcliffe,

---

[2] The stricken amendments would have restricted owners' rights to subdivide larger lots into smaller ones and convey them without majority consent (§ 3.10); imposed minimum dwelling and lot sizes (§§ 3.10(c), (f)); permitted a manager to collect "quasi-punitive" fees if required to undertake special maintenance or enforcement duties (§ 4.2 ¶ 2); and authorized compliance and enforcement provisions to address violations (§§ 5.2, 5.3). No party challenged the trial court's ruling striking these provisions.

concurring in part and dissenting in part, argued that the majority's reliance on each amendment's harmony with the general-purpose statement of the original declaration would permit "a gauzy statement of purpose" to justify any new amendment, thereby rendering *Dreamland*'s notice requirement "a nullity." *Id.* at *10 ¶ 39 (Brearcliffe, J., concurring in part and dissenting in part).

¶7 We granted review because the petition raises issues of statewide importance regarding the scope of an HOA's authority to amend CC&Rs. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## II. DISCUSSION

¶8 Initially, we consider whether the original declaration must provide notice of prospective amendments. If an amendment is invalid, we "blue pencil" the amended CC&Rs, striking severable provisions. *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 372 ¶ 30 (1999) ("Arizona courts will 'blue pencil' restrictive covenants, eliminating grammatically severable, unreasonable provisions.").

### A. Standard of Review

¶9 We review questions of law, including the interpretation of CC&Rs and the grant of summary judgment, de novo. *Powell v. Washburn*, 211 Ariz. 553, 555–56 ¶ 8 (2006); *Glazer v. State*, 237 Ariz. 160, 167 ¶ 29 (2015). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a).

### B. Notice Requirement

¶10 Arizona law permits the amendment of CC&Rs by a majority vote if such voting scheme is specified in the original declaration. A.R.S. § 33-1817(A). But § 33-1817(A) does not displace the common law, which prohibits some amendments even if passed by a majority vote. The original declaration must give sufficient notice of the possibility of a future amendment; that is, amendments must be reasonable and foreseeable. *See Dreamland*, 224 Ariz. at 51 ¶ 38; *see also Shamrock v. Wagon Wheel Park Homeowners Ass'n*, 206 Ariz. 42, 45–46 ¶ 14 (App. 2003); *Wilson v. Playa de Serrano*, 211 Ariz. 511, 513 ¶ 7 (App. 2005).

4

**¶11**        In defining the contours of reasonableness and foreseeability, we find *Dreamland*'s reasoning compelling.  The homeowners in *Dreamland* collectively comprised Dreamland Villa, a residential community with eighteen sections.  *Dreamland*, 224 Ariz. at 43 ¶ 2.  Dreamland Villa Community Club, Inc. ("DVCC") was "a nonprofit corporation by volunteer members to provide recreational facilities to those who joined the club."  *Id.* ¶ 3.  Membership in the DVCC was voluntary and carried a membership fee.  *Id.* at 48 ¶ 23.

**¶12**        Each of the eighteen Dreamland Villa sections had its own respective set of CC&Rs.  *Id.* at 43 ¶ 4.  For all but one of the sections' original declarations, there was no mention of DVCC.[3]  *Id.*  And each of the original declarations, like the original declaration here, contained an "amendment by majority vote" provision.  *Id.* at 43–44 ¶ 4.  Under this provision, a majority of the homeowners voted to amend the original declarations to make DVCC membership mandatory and impose annual assessments.  *Id.* at 46 ¶ 18.  After DVCC brought claims against minority homeowners who failed to pay annual assessments, the minority homeowners challenged the validity of the amendments mandating DVCC membership.  *Id.* at 44 ¶¶ 7–9.

**¶13**        The court of appeals held that the amendments imposing mandatory DVCC membership were not enforceable against the homeowners because the original declarations did not provide "proper notice that such servitudes could be imposed non-consensually under the generic amendment power."  *Id.* at 51 ¶ 38.  Thus, under *Dreamland*, even a broad grant of authority to amend an original declaration is insufficient to allow a majority of property owners to adopt and enforce restrictions on the minority without notice.  *Id.*

**¶14**        Like *Dreamland*, we hold that an HOA cannot create new affirmative obligations where the original declaration did not provide

---

[3]        All members paid a membership fee, but section eighteen's original declaration also imposed annual assessments on non-members to fund the club.  *Id.* at 43–44 ¶¶ 4–5.  The court nonetheless found that "homeowners in section 18 were in the same position with reference to DVCC" as the other homeowners prior to the amendments because, by imposing annual assessment fees on non-members only, section eighteen's original declaration acknowledged that DVCC membership was not mandatory.  *Id.* at 47–48 ¶¶ 22–23.

notice to the homeowners that they might be subject to such obligations. CC&Rs form a contract between individual landowners and all the landowners bound by the restrictions, as a whole. *Powell*, 211 Ariz. at 555 ¶ 8; *Playa de Serrano*, 211 Ariz. at 513 ¶ 7. Although contracts are generally enforced as written, *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 213 Ariz. 83, 86 ¶ 12 (App. 2006), in special types of contracts, we do not enforce "unknown terms which are beyond the range of reasonable expectation," *Darner Motor Sales, Inc. v. Universal Underwriters Ins.*, 140 Ariz. 383, 391 (1984) (quoting Restatement (Second) of Contracts § 211 cmt. f (Am. L. Inst. 1981)). CC&Rs are such contracts.

¶15 The notice requirement relies on a homeowner's reasonable expectations based on the declaration in effect at the time of purchase—in this case, the original declaration. Under general contract law principles, a majority could impose any new restrictions on the minority because the original declaration provided for amendments by majority vote. But allowing substantial, unforeseen, and unlimited amendments would alter the nature of the covenants to which the homeowners originally agreed. *See Dreamland*, 224 Ariz. at 51 ¶ 38. Thus, "[t]he law will not subject a minority of landowners to unlimited and unexpected restrictions on the use of their land merely because the covenant agreement permitted a majority to make changes to existing covenants." *Boyles v. Hausmann*, 517 N.W.2d 610, 617 (Neb. 1994).

¶16 To determine whether the original declaration gave sufficient notice of a future amendment, we must look to the original declaration itself. "Because covenants originate in contract, the primary purpose of a court when interpreting a covenant is to give effect to the original intent of the parties" with any doubts resolved against the validity of a restriction. *Armstrong v. Ledges Homeowners Ass'n*, 633 S.E.2d 78, 85 (N.C. 2006) (emphasis omitted). We apply an objective inquiry to determine whether a restriction gave notice of the amendments at issue. *See* 1 *Williston on Contracts* § 3:4 (4th ed. 2021) ("Whether there is mutual assent to the terms of a contract is determined by an objective test, rather than the subjective intentions of the parties.").

¶17 The restriction itself does not have to necessarily give notice of the particular details of a future amendment; that would rarely happen. Instead, it must give notice that a restrictive or affirmative covenant exists and that the covenant can be amended to refine it, correct an error, fill in a

gap, or change it in a particular way. *See Armstrong*, 633 S.E.2d at 87. But future amendments cannot be "entirely new and different in character," untethered to an original covenant. *Lakeland Prop. Owners Ass'n v. Larson*, 459 N.E.2d 1164, 1167 (Ill. App. Ct. 1984). Otherwise, such an amendment would infringe on property owners' expectations of the scope of the covenants.

## C. Application to Calabria Ranch's Amendments

¶18 Applying these principles here, very few of the challenged amendments survive. Neither the general-amendment-power provision nor the general-purpose statement is sufficient to provide notice of the challenged amendments. *See id.*

¶19 The original declaration stated: "This Declaration may be amended at any time by an instrument executed and acknowledged by the Majority Vote of the Owners which shall not be effective until the recording of such instrument." Although the plain language of this general-amendment-power provision would permit any amendments by majority vote under traditional contract law, our holding today requires that the original declaration give fair notice of any enacted amendment.

¶20 Similarly, the general-purpose statement in Calabria Ranch's original declaration was simply too broad and subjective to give notice of future amendments. The "purpose" of the CC&Rs, according to the original declaration, was to "protect[] the value, desirability, attractiveness and natural character of the Property." Although Arizona courts construe the language in CC&Rs "in light of the circumstances surrounding its formulation, with the idea of carrying out its object, purpose and intent," *Cypress on Sunland Homeowners Ass'n v. Orlandini*, 227 Ariz. 288, 297 ¶ 31 (App. 2011) (quoting *Powell*, 211 Ariz. at 557 ¶ 16), relying solely upon a subjective general statement of purpose would provide limitless justification for new amendments.

¶21 Because the general-amendment-power provision and general-purpose statement were not sufficient to provide notice of future amendments, we next analyze each challenged amendment separately under *Dreamland*. Applying the blue pencil rule, we strike unauthorized terms from several amendments and where we find amendments invalid in their entirety, we strike them and concur with the deletion of the

amendments stricken by the trial court. *See Valley Med. Specialists*, 194 Ariz. at 372 ¶ 30.

1. Section 1.3: Dwelling

**¶22**        Amended § 1.3 limits "dwellings" to 60% living space and 40% garage. The original declaration provided no limitations on the size of garages or living spaces and only required that all residences be "Single Family Dwellings," without defining the term. Nothing in the original declaration restricting residences to single-family dwellings would put a property owner on notice that the Other Owners could, by majority vote, now limit the size of his residence.

**¶23**        We revise amended § 1.3 as follows using strikeouts to reflect deletions: "'Dwelling' shall mean a single-family dwelling that is a permanent structure affixed to a Lot and used for residential purposes by a single family. ~~Moreover, a dwelling must have at least 60% living space and at most 40% Garage, as defined below.~~"

2. Section 1.5: Garage

**¶24**        Although "Garage" was not defined in the original declaration, we find its inclusion permissible because § 3.3 of the original declaration referenced a "garage." Thus, a later amendment defining the term was reasonably foreseeable.

3. Section 1.6: Improvement; Section 3.7: Setbacks

**¶25**        The amended CC&Rs replace the word "structures" with "Improvements" in the Setbacks provision, § 3.7. Another amendment, § 1.6, defines "Improvement" as "any changes, alterations or additions to a Lot, including any Dwelling, and including but not limited to buildings, outbuildings, patios, swimming pools, driveways, grading, excavation, landscaping, and any structure or other improvement of any kind." Read in conjunction with the amended Setbacks provision, this new definition prevents landowners from digging even one hole within fifty feet of their property line, whereas under the original declaration landowners were prevented only from building a structure. Landowners were not provided notice in the original declaration that restrictions on building structures

could be expanded to restrictions on any improvement whatsoever by majority vote.

**¶26**         We revise § 1.6 as follows: "'Improvement' shall mean any changes, alterations or additions to a Lot, including any Dwelling, and including but not limited to buildings, outbuildings, patios, swimming pools, ~~driveways, grading, excavation, landscaping,~~ and any structure ~~or other improvement of any kind~~."

**¶27**         In view of our revisions to § 1.6, we find amended § 3.7 valid.

### 4.   Section 1.13: Votes

**¶28**         Additions to the "Votes" section are invalid.  The original declaration allocated votes per lot but was silent on the effect future subdivision would have on vote allocation.  The amended CC&Rs add: "In the event of any potential future subdivision of the Lots, the allocation of Votes shall remain the same with any additional lots or parcels having no Vote under this Declaration."  The original declaration did not provide for subdivision.  Although the amendment provision provided notice that future amendments could account for subdivision, no notice was provided that future subdivision may result in a loss of voting power for new lot owners, thus potentially lessening the value of these lots.

**¶29**         We revise § 1.13 to read: "'Votes' shall be allocated as follows: one (1) Vote per Lot, as identified in the attached Survey, with the exception of Lot 2, which shall have two (2) Votes. ~~In the event of any potential future subdivision of the Lots, the allocation of Votes shall remain the same with any additional lots or parcels having no Vote under this Declaration~~."

### 5.   Section 3.1: Livestock

**¶30**         As amended, the portion of § 3.1 changing the types and quantity of permissible "livestock" is invalid.  The original declaration stated: "No Owner or Occupant shall keep more than six (6) livestock on the Property including, but not limited to, horses/cattle per 3.3 acres."  Amended § 3.1 limits livestock to "chickens, horses, and cattle only" and, while retaining the six livestock per 3.3 acres ratio, caps the total number of permitted livestock units at fifteen regardless of the size of the lot.

¶**31**        The intended definition of "livestock" is unclear. Merriam-Webster defines "livestock" as "animals kept or raised for use or pleasure[;] especially: farm animals kept for use and profit." *Livestock*, Merriam-Webster, https://www.merriam-webster.com/dictionary/livestock (last visited Mar. 14, 2022). This broad definition could include any number of animals of varying sizes, but because of the numerical limitation and the specific mention of horses and cattle, the original declaration appears to have contemplated only large animals. The CC&Rs limited the number of livestock in proportion to the size of the lot, indicating that the size of the lot, and therefore the size of the animals, was a factor in the limitation. In conjunction with the *noscitur a sociis* canon, which instructs us to interpret an unclear word or phrase according to the words immediately surrounding it, *Noscitur a sociis*, Black's Law Dictionary (11th ed. 2019), reasonable landowners might interpret "livestock" to mean only large animals like horses and cattle. Thus, reasonable landowners might believe the original declaration was silent regarding smaller animals, such as chickens. They would find support in Arizona law, which does not consider "poultry" to be "livestock." A.R.S. § 3-1201(5), (7).

¶**32**        We need not determine exactly which animals were considered "livestock" in the original declaration. Whatever the definition, under the original declaration, livestock was expressly "not limited to" horses and cattle. And reasonable landowners may have believed chickens were *not* livestock under the original declaration, and therefore not subject to the number limitation. An amendment that redefines "livestock" so drastically so that other livestock are prohibited by the amendment is not reasonable or foreseeable. This change unreasonably alters the nature of the original CC&Rs and was not portended by them.

¶**33**        Furthermore, the amended CC&Rs impose a new limit on livestock. In the original declaration, landowners were allowed six livestock per 3.3 acres. Now, landowners cannot own more than fifteen livestock animals regardless of the size of the lot. Irrespective of the change in number of permitted livestock, the livestock amendment is different in kind from that in the original declaration. The original livestock limitation is proportional to the size of the owners' lots. A landowner would not likely

foresee a numerical cap on lots regardless of acreage, such as that in amended § 3.1.[4]

¶34      Accordingly, we revise § 3.1 as follows: "No Owner or Occupant shall keep more than six (6) livestock animal units per 3.3 acres on their Lot and livestock shall be limited to chickens, horses, and cattle only. In no event shall any Lot contain more than fifteen (15) livestock units."

### 6. Section 3.8: Non-Dwelling Structures

¶35      Newly added § 3.8 is invalid. The original declaration placed no limitation on the location, placement, or size of "non-dwelling structures." But this new section limits non-dwelling structures to 2500 total square feet in area and eighteen feet in height and prohibits them from obstructing any "views" of neighboring lots. Nothing in the original declaration put a reasonable homeowner on notice that his or her neighbors might impose such restrictions. We strike § 3.8 in its entirety.

### 7. Section 3.9: Improvement Plans

¶36      Newly added § 3.9 is similarly invalid. In addition to defining "Improvement" in § 1.6, the amended CC&Rs create a requirement that any "construction plans" for "Improvements" be submitted to and approved by a majority vote. Given the new definition of "Improvement" in § 1.6, the consequence of § 3.9 is that, whether it is a house, a patio, or other structure, a property owner must now submit construction plans to his or her neighbors for their approval. Nowhere in the original declaration was any such approval process required. Nothing in the original declaration put a reasonable property owner on notice that an otherwise permissible use of his or her property would be subject to approval by a majority vote of his or her neighbors. Because the original declaration did not provide Kalway with notice, and this amendment to the CC&Rs was adopted without his consent, § 3.9 is invalid and stricken in its entirety.

---

[4]      Kalway further argues that certain amendments are invalid because they affect only his lot. In view of our decision to invalidate this amendment, we do not address this argument.

8.  Sections 3.10(b), (d), (e), (g), (h): Subdivision and Improvements

¶37          Challenged subsections 3.10(b), (d), (e), (g), and (h) are invalid and stricken in their entirety. Additionally, the first sentence of the general provision in § 3.10 is invalid and likewise stricken. Section 3.10 prohibits owners from subdividing their own lots without a majority vote of all of Calabria Ranch's property owners, yet no property owner was ever put on notice that such a requirement might be considered in the future.

¶38          Subsection (b) requires the submission of improvement plans to the "Owners and Manager, in writing" at least thirty days before making such improvements. No requirement for submission of improvement plans was contained in or implied by the original declaration.

¶39          Likewise, the original declaration mentioned no limit to the number of non-residential structures on a lot, nor did it control the sequence of their construction—now contemplated in subsections (e) and (d), respectively. In the amended CC&Rs, however, the Other Owners now impose limits on both the number and type of structures on a lot and when such structures may be built. Nothing in the original declaration made any mention of such limitations or mandatory sequencing, and reasonable property owners would not have expected that any such future provisions would be imposed without their consent. It is not uncommon for homeowners to have a number of buildings on their property, such as a guesthouse, greenhouse, shed, or detached garage. Under this amendment, an owner would have to choose only one of the above structures and is prohibited from building beyond that.

¶40          Moreover, nowhere in the original declaration did it mention restrictions on the environmental impact in riparian areas—now contemplated in § 3.10(g)—or the obstruction of views—now regulated in § 3.10(h). The original declaration did not contain any language indicating that such amendments might be adopted in the future.

9.  Section 7.2: Fallen Deadwood, Dried Undergrowth, and other Fire Hazards

¶41          Newly added § 7.2 is invalid. Under this new requirement, owners must maintain their properties such that dried undergrowth is less than one-foot high and all fallen deadwood longer than three feet is cut into

six-inch-or-less pieces. As the court of appeals' partial concurrence and dissent noted, while this provision might be advisable to prevent wildfires, no language in the original declaration put property owners on notice that fallen branches on their property would later be regulated by the CC&Rs. *Kalway*, 2020 WL 1239831, at *10 ¶ 38 (Brearcliffe, J., concurring in part and dissenting in part). We strike § 7.2 in its entirety.

### III. CONCLUSION

¶42        We reverse the trial court in part and remand for entry of summary judgment in part for Kalway and in part for Calabria Ranch. We vacate the court of appeals' decision and award attorney fees to Kalway in this Court and in the court of appeals.